*Underwood* for appellants: *B. & A. Monroe* for appellees.

---

CHANCERY.      Latham's Executors and Heirs *vs* Morrow, *et al.*

*Case 145.*      APPEAL FROM THE BOURBON CIRCUIT.

*Vendors and purchaser.   Rescission of contracts.*

*May 2.*      JUDGE MARSHALL delivered the opinion of the Court.

WE do not concur in the opinion of the Circuit Court,

The employment of, and bidding by a by-bidder, is not always a sufficient ground to rescind the contract; it is entitled to but little weight where the price is not exhorbitant, and there has been a long acquiescence by the purchaser.

that the contract in this case should be rescinded, on the ground of fraud in the sale, alledged to have consisted in the secret employment by Latham, of a by-bidder, who is charged to have run up the land higher than it would otherwise have gone, and to an exhorbitant price. The price bid, although high, was not exhorbitant, nor as we feel authorized by the facts to assume, was it above the fair value of the land, as estimated at the time, by the purchasers themselves, as well as by others; and if the employment of a single by-bidder, or rather the acceptance of the services of one who voluntarily and at his

own instance, offered himself, for the purpose of prevent-
ing the land from selling at a lower price, should be deem-
ed a fraud, which gave the right of rescission on that
ground, we are of opinion that under the circumstances of
this case, the right must be considered as lost or waived;
and at any rate, is not so presented as to be available. It
does not appear that there was any writing by which
either Latham or the purchasers were bound, until the
day after the auction sale,. when by the hesitation and
temporary refusal of Latham to enter into a written con-
tract, the purchasers had a fair opportunity of retracting
on their part, as it may be presumed they would have
done, or at least suggested, even if then ignorant of the
by-bidding, if they had then considered their bid as ex-
horbitant, or as being above the fair value of the land.
But instead of this, they rather urged the completion of
the contract, which was in fact written and executed as
soon as Latham became willing. If they had not an op-
portunity of discovering that they had been cheated in
the price of the land, before they entered into the writ-
ten contract, surely they ought to have discovered the fact,
and might have discovered the means by which it was ac-
complished, before they had been five years in posses-
sion. During all that time, we hear of no complaint as
to the price of the land. But in an answer filed more
than three years after the purchasers had possession, in
which they object to the title exhibited by the complain-
ants, and pray for a rescission for want of title, they avow
that they had always been willing to complete the pay-
ments if a title could be made; and it is not until two
years after, when the estimated value of land in the coun-
ty had depreciated fifty per cent. since their first answer,
that they file an amendment, suggesting for the first time,
the alledged fraud and the exhorbitance of the price; and
they do not, either by this answer or otherwise, show or
even alledge that they had recently discovered the fact
complained of, or when they had discovered it, or that they
were, in fact, ignorant of it either on the day of sale or
on the next day after, and before the writings were exe-
cuted. They were not cheated in the price of the land.
They were not cheated even out of their own judgment

as to its value; but at most; they were cheated into giving or agreeing to give, what in their own judgment was a fair price, and were thus deprived of a profit which otherwise, they might perhaps have made at the loss of the vendor. Surely such a complaint is not entitled to any peculiar favor in a Court of Equity. Even in cases of gross fraud and palpable injury, promptness in disavowing the contract on that ground, is required from the defrauded party, as being essential to the ends of justice. The law protects even the fraudulent party from the injury and oppression which might ensue, if the other party were allowed, with the means of avoiding the contract for fraud completely in his power, to choose his own time for so doing.

In view of these principles, and of the doubtful nature of the enquiry complained of, taken in connection with the evidence of long acquiescence and satisfaction with the contract, and the suspicion fairly arising, that the complaint of fraud would never have been urged but for the general depreciation in the price of land, and the fact that there is not even an allegation of recent discovery, when the complaint is at last made, we conclude, without deciding the abstract question as to the right of the vendor at auction, to employ a single by-bidder to prevent a sacrifice below a fair and fixed price, that this contract should not be rescinded on the sole ground of fraud.

*The question whether it is a ground in any case, to rescind because one by-bidder was employed to prevent a sacrifice, left undecided.*

There are however objections to the derivation of title as attempted to be made out by the complainants, which are sufficient until removed, to prohibit the enforcement of the contract against the will of the purchasers, and if not removed to require a rescision on their prayer. As to 50 acres of the land conveyed to Latham by Sodusky, and for which the purchasers agreed to take a quit claim deed, there is no difficulty. But as to the remaining 131½ acres, the complainants have no legal title. That part of the land is covered by a patent for 1000 acres grantde to Peter Casey in 1785. Shortly after the grant, Casey sold the whole tract to Isiah Hite, and in 1787, Hite sold it to Neale by a *written executory contract, which is exhibited.* In 1794, Neale gave his bond to Conway for 75 acres, and

*The derivation of title made out by vendor not good.*

to N. D. Amos for 125 acres, and under these two bonds, possession has been held for more than fifty years. The complainants alledge that Conway sold 100 acres to J. J. Amos, who sold the same (together with the 50 acres above mentioned) to Latham. But while it is clearly established that the possession has been accordant with those alledged transfers of the equity, there is no written evidence in this record, of the transfer from Conway to Amos, nor is the date of the transfer, either of title or possession alledged or proved. There is no doubt, however, from the proof, that Conway did sell to Amos.; and that the equity to this 100 acres is as against Conway's heirs complete. But the bill gives no account of the manner in which Conway, who had a bond from Neal for 75 acres, became entitled to 100 acres, and it is only from the oral testimony that we may assume that Conway made up the additional 25 acres out of three shares in the 125 acres, which Neal had sold to N. D. Amos. He died in 1815, leaving fourteen heirs, between whom the tract of 125 acres was informally devided about the year 1821 or 1822. Assuming that Conway had possession of three of these fourteen shares, as early as 1821, of which however there is no direct evidence, still we should also assume that one of these shares was that of his wife who was a daughter of Amos, and it is intimated in the evidence that one of these shares purchased by him, was sold by the husband of another female heir. And the question is whether a possession of 25 years up to the date of the trial, is sufficient to raise the presumption of a valid transfer of the equities of these *femes covert* or to extinguish them in favor of the possessor. To this question, based upon assumptions probably true, but certainly the most favorable to the complainants which the facts will authorize, we are not prepared to give an affirmative answer. All that can be said is, that considering the smallness of the share of each heir in the 125 acres, descended from N. D. Amos, the consequent probability of a sale, the fact that the *femes* through whom these 25 acres are claimed, are no longer in the State, but they or their descendants have probably long been enjoying the advantage in other States, of larger possessions purchased

in part by the proceeds of these minute parcels, it is high-
ly probable that the transfers of the interests of these *femes*
though made by the husbands alone, have been constant-
ly approved and will never be questioned either by the
*femes* or their heirs. As to eighteen acres of the twenty
five, or perhaps as to the whole twenty five acres, this is
the best foundation on which we can place the claim of the
complainants. It does not in our opinion, amount to an
enforcible equity against the *femes* or their heirs. And
the complainants having so far failed in showing them-
selves able to coerce a conveyance at the rendition of the
decree, were so far unprepared for executing the contract
on their part, or demanding its enforcement against the
purchasers.

The remaining 31¼ acres are claimed under Nicholas
D. Amos, through Daniel Thomas, who, in 1821, under-
took to transfer six of the fourteen shares to John Parker,
from whom, by various mesne assignments, Latham ac-
quired an interest to the extent of 29¼, or perhaps 31¼
acres. Thomas probably had possession of these six
shares, when he sold in 1821 ; and as to four of them,
claimed as the shares of male heirs, transferred by them-
selves, the equity of the complainants may be regarded
as complete; though as to one of the shares, no written
transfer is produced. But one of the six shares which
Thomas professed to sell, was that of his wife, a daugh-
ter of N. D. Amos, and another was that of E. Parker,
then deceased, whose children, nine or ten in number,
were all either *femes covert* or infants, at the date of their
transfer to Thomas. Conceding that the lapse of time
furnishes sufficient evidence of confirmation by the in-
fants, who were not married women, still there are the
shares of four married women, who joined in this trans-
fer, and the share of Mrs. Thomas, which stand substan-
tially on the same footing as those of the *femes covert*,
whose interest Conway probably undertook to transfer;
except that the share of E. Parker being subdivided
among her heirs, gave not more than one acre each, and
that the loss, if any should occur by the assertion of these
claims against the transfer by Thomas, would be divided
between Latham and the other party holding under that

transfer, so that not more than seven or eight acres could, on this account, be lost out of Latham's interest. In the whole quantity of 131½ acres, there is hazard of loss only to the extent of about twenty five or thirty two acres; and this hazard is not only to be considered small in consequence of the lapse of time, during which there has been an entire acquiescence in the possession held under Thomas and Conway, but is greatly diminished by the descents which have probably occurred during the interval, whereby the several adverse interests, originally small, have become more minute and less valuable. It is to be added too, as a circumstance tending, not only to diminish the hazard of any future disturbance from these interests, but also to show that the claim of Latham, though technically defective, is good in conscience, even against these adverse equities, that there is no reason to doubt that fair equivalents were given at the time of their transfer, and have been enjoyed by the *femes* and their children since, and that these equivalents are probably at least, equal in value to the interests which might have been asserted in this land, and may present substantial obstacles to the assertion of claims in this land, in opposition to the sales of the male vendors in right of their wives.

If, as the complainants seem to have supposed, when their bill was filed, their ancestor had obtained the legal title by the conveyance from the executors of Abraham Hite, who was one of the executors of Isaac Hite, there could have been little doubt of their right to enforce the contract, notwithstanding the defects which have been noticed in the chain of equitable title. The most that could have been required of them, would have been sufficient security against the future assertion of these adverse equities, or a proportional suspension of the collection of so much of the purchase money, until all doubt as to disturbance of the purchasers might be removed. And although mistaken with regard to the legal title, still if they had shown, what though quite probable, is not proved, and cannot, upon the lapse of twenty five years, be presumed, that these adverse equities have been barred by lapse of time, since they might have been asserted by the

*femes* or their heirs, independently of the husband, we should regard the case as sufficiently made out for enforcing a specific performance. As the case is, we are not satisfied that under a contract which, in view, probably, of the very difficulties which have occurred, contemplates delay in procuring the legal title, and provides for it by authorizing the purchasers to retain the second instalment, being one half of the purchase money, until the vendor shall procure and convey the title, the vendees are entitled to a rescission because the title is not yet procured, and the complainants were not prepared, on the hearing of the cause, to coerce it.

It is true the complainants came into equity to enforce the contract, and should have been prepared at the hearing, to comply on their part. But except the executor, they are all infants, and as already intimated, they filed their bill under the mistaken supposition that they had the legal title; and a perfect equity. It is also true, that by agreement appearing in the record, the cause was submitted for decree upon the question of rescission or specific performance, the purchasers admitting that the title might be coerced from the patentee down to Neal, upon proper preparation, which in case a specific performance should be decreed, was to be made, but reserving other objections to the title and the sale. But as these complainants could not coerce the title from the patentee to Neal, unless they were prepared to coerce it from Neal to themselves, there is a difficulty in determining the precise effect which this partial submission should have upon the preparation of the case as between the complainants and the heirs of Neal and other intermediate parties connected with their derivation of title. Suppose there were sufficient allegations in the bill, but proper parties were not made for the coercion of this part of the title, or that without sufficient allegations or parties, the proof authorized the inference that upon proper allegations, and with the proper parties before the Court, the title might be coerced, these cases are not provided for by the agreement; and yet in either of them there could not properly be a decree independently of the agreement, either for a specific performance or for a res-

cission. But time should have been allowed for further preparation.

If the effect of the agreement is that in either of these cases the contract must be rescinded, because it cannot be at once enforced, it is unequal and gives an improper advantage to the purchasers. The Chancellor, so far as the case depended upon the question of title, might well have refused to take it on the submission, or might have disregarded the restrictions upon his equitable discretion. And as he did in fact decide the cause upon the question of fraud, and without referrence to the title or to the preparation of the suit, with regard to the numerous parties who appear to be necessary as heirs of Neal and Conway, and N. D. Amos, and as moreover the facts already referred to create a strong probability that upon proper allegations and preparation as to parties, the title may be procured, we feel authorized to send the cause back for such additional pleadings and proof, as may enable the Court to determine satisfactorily how far the complainants have an enforcible equity to the land, and whether if there be any defect, it is sufficient to justify a rescission of the contract. There might have been good reason for hearing the cause on the question of fraud alone, leaving the question as to title, for further preparation, or future adjudication. But there could not well be a partial hearing as to the title, before a full preparation on that point; and as the Court below decided merely on the fraud, we reverse the decree without deciding the case, as it now stands, on the question of title. This conclusion will of course, suspend all proceeding founded on the decree of rescission; as well those for adjusting the equitable rights of the parties to the contract, as those which relate to the dower of Latham's widow. And upon these proceedings we make no other remark than to say, that we do not perceive why the lien of Joseph J. Amos, for the unpaid portion of the purchase money for the 150 acres sold by him to Latham, should be restricted to the 50 acres conveyed by Sodusky, and in which the widow's right of dower is superior to the lien of the purchasers from her husband, in case of a rescission. Indeed we are not sure upon the facts appearing,

*Margin note:*

LATHAM'S EX'RS. AND HEIRS
*vs*
MORROW, *et al.*

The Court below having decided the case expressly on the alledged fraud and not on the validity of the title offered; the cause is reversed and sent back for further preparation on that point, and for final decree.

GORHAM
*vs*
LUCKETT.

that Amos has any lien upon the 50 acres, after he parted with his equity and the legal title was conveyed to his vendee, and there seems to be no reason for confining his lien to the residue of the 150 acres, since the equity to that is still claimed through him. But it is unnecessary now to decide these points.

The decree rescinding the contract is reversed and the cause remanded for further proceedings consistent with this opinion.

*Hawes and Williams* for appellants: *Robinson & Johnson and Thornton* for appellees.