**PEOPLE OF THE VIRGIN ISLANDS, Plaintiff**

**v.**

**BASHEEM C. FORD and JERMAINE S. PARIS, Defendants**

Crim. Nos. 76/2008, 109/2008

Superior Court of the Virgin Islands

Division of St. Thomas and St. John

July 7, 2009

30

33

JESSE M. BETHEL, JR., ESQ., Assistant Attorney General, V.I. Department of Justice, St. Thomas, USVI, *Counsel for the People.*

STEVEN HOGROIAN, ESQ., Kotas and Hogroian, P.C., St. John, *Counsel for Defendant, Mr. Basheem C. Ford.*

SAMUEL L. JOSEPH, ESQ., Territorial Public Defender, St. Thomas, V.I., *Counsel for Defendant, Mr. Jermaine S. Paris.*

KENDALL, *Judge*

## MEMORANDUM OPINION

(July 7, 2009)

**THIS MATTER** came on for Hearing on June 4, 2009 on remand from the Supreme Court of the Virgin Islands. Based upon the reasons set forth below, this Court will recuse itself from the matter and return same to the Clerk of the Court for reassignment.

## FACTUAL AND PROCEDURAL BACKGROUND

On January 30, 2008 and March 6, 2008, the People filed separate Informations charging the Defendants Ford and Paris respectively with thirteen (13) Counts including aiding and abetting each other in the First Degree Murder of Police Officer Ariel Frett.[1] On June 18, 2008, the People filed a superseding 22-Count "Consolidated Information"[2]. A final pre-trial conference was scheduled for January 30, 2009 with Jury Selection and Trial scheduled for February 2, 2009. On January 27, 2009, Defendants filed separate "Emergency Motion to Enforce Plea Agreement," contending that on January 16, 2009, the People had orally extended plea offers to each of them to plead "Guilty" to one count of "Involuntary Manslaughter" in exchange for dismissal of the remaining Counts of the "Consolidated Information." *See* Defs "Mot. To Enforce Plea Agreement" Pg. 1. Defendants further contended that they orally accepted the plea offer on January 26, 2009 but shortly thereafter the People's Counsel, Assistant Attorney General Jesse Bethel, Jr., denied

---

[1] Both Defendants were also charged with one Count each of Second Degree Murder, Aiding and Abetting, in violation of 14 V.I.C. §§ 921, 922(a)(2); Unauthorized Use of a Firearm During the Commission of a Second Degree Murder, Aiding and Abetting, in violation of 14 V.I.C. §§ 2253(a), 11; First Degree Assault, Aiding and Abetting, in violation of 14 V.I.C. §§ 295(1), 11; Unauthorized Use of a Firearm During the Commission of a First Degree Assault, Aiding and Abetting, in violation of 14 V.I.C. §§ 2253(a), 11; Voluntary Manslaughter, Aiding and Abetting, in violation of 14 V.I.C. §§ 924, 11; Carrying an Unlicensed Firearm During the Commission of Voluntary Manslaughter, Aiding and Abetting, in violation of 14 V.I.C. §§ 2253(a), 11; 2 Counts of Third Degree Assault, Aiding and Abetting in violation of 14 V.I.C. §§ 297(2), 11; 2 Counts of Unauthorized Use of a Firearm during the Commission of Third Degree Assault in violation of 14 V.I.C. §§ 2253(a), 11; Unauthorized Possession of Ammunition in violation of 14 V.I.C. §§ 2256 and Possession of Stolen Property in violation of 14 V.I.C. 2101(a).

[2] Both Defendants were charged with 2 Counts of First Degree Murder, Aiding and Abetting, in violation of 14 V.I.C. §§ 921, 922(a)(1), 11; 2 Counts of Second Degree Murder, Aiding and Abetting, in violation of 14 V.I.C. §§ 921, 922(a)(2); 2 Counts of Unauthorized Use of a Firearm During the Commission of Second Degree Murder, Aiding and Abetting in violation of 14 V.I.C. §§ 2253(a), 11; 2 Counts of First Degree Assault, Aiding and Abetting, in violation of 14 V.I.C. §§ 295(1), 11; 2 Counts of Unauthorized Use of a Firearm During the Commission of First Degree Assault, Aiding and Abetting, in violation of 14 V.I.C. §§ 2253(a), 11; 2 Counts of Voluntary Manslaughter, Aiding and Abetting, in violation of 14 V.I.C. §§ 924, 11; 2 Counts of Carrying an Unlicensed Firearm During the Commission of Voluntary Manslaughter, Aiding and Abetting, in violation of 14 V.I.C. §§ 2253(a), 11; 4 Counts of Third Degree Assault, Aiding and Abetting, in violation of 14 V.I.C. §§ 297(2), 11; 4 Counts of Unauthorized use of a Firearm During the Commission of Third Degree Assault, Aiding and Abetting, in violation of 14 V.I.C. §§ 2253(a), 11;

ever making such an offer and told Counsel for Defendant Ford that the latter was in error and was mistaken in his understanding of the Plea offer. *Id.* at 3.

During the final pre-trial conference held in Chambers, the Court heard argument on the "Motions to Enforce Plea Agreement." Attorney Bethel represented to the Court that he "may have misspoken. I am not saying that I did. And may be Attorney Hogroian may have misunderstood the word voluntary or involuntary. I may have even said it . . . And I had, I think I made it very clear that when I extended the plea offer, no matter what it was, that the deadline to respond was Friday the 23rd, I'm sorry, Friday the 26th of January . . ." Tr. Pg. 4.

In light of Attorney Bethel's denial, Attorney Hogroian offered to play a voice recording of the plea offer and did so with the Court's permission. Attorney Bethel was clearly and unambiguously heard to offer Defendants a plea to "Involuntary Manslaughter," not "Voluntary Manslaughter," as he contended. Furthermore, contrary to his representation to the Court, there was no deadline of January 26, 2009 for Defendants to accept the offer. Rather, Attorney Bethel stated. "I need to get a response as soon as possible in that trial is scheduled for jury selection on Monday, February the second." Tr. Pg 7.[3]

Based upon the argument of Counsel, the Court determined that the parties had entered into an oral contract and scheduled the matter for "Change of Plea" hearing on February 2, 2009 at 4:00 p.m.[4] Attorney Bethel informed the Court that he would not be present at the Hearing, presumably because he disagreed with the Court's ruling. Tr. Pg. 22.

The Court was ready to proceed with the "Change of Plea" hearing as scheduled but was informed by the Marshal that Attorney Bethel was not present, whereupon the Court decided to give him some additional time to appear. At 4:15 p.m., Court convened with Defendants and their

---

[3] This was not the first time Attorney Bethel had misrepresented matters to the Court. Indeed, a review of his "Motion for Stay and Petition for Expedited Writ of Mandamus, etc." in this matter reveals that it is replete with false statements and calumny directed at the Court as will be made clear herein.

[4] It is not an unusual practice in the Superior Court for the parties to advise the Court that they have orally entered into a plea agreement and the matter set for a "Change of Plea" Hearing. At that time, a written agreement would normally have been executed and presented in Court, together with an Amended Information, if necessary, reflecting the Count(s) to which the Defendant would plead "Guilty", if not included in the Information.

Counsel present. Attorney Bethel was not present and inasmuch as he had previously indicated that he would not be appearing, the Court issued a warrant for his arrest. He was arrested at approximately 4:30 p.m. that day and remanded to the Bureau of Corrections.

On February 3, 2009, Attorney Bethel appeared in Court with Counsel. Despite having made clear on the record that he would not appear for the "Change of Plea" hearing, he apologized to the Court for his "tardiness" which he attributed to being "in the process of filing papers, looking for parking space" and discussing another case with Attorney Arturo Watlington. *See*, "Record of Proceedings", February 3, 2009. Notwithstanding his prevarications, the Court ordered his release. His arrest and release generated widespread coverage in both the print and electronic media throughout the Territory and in connection therewith, the terms of the oral plea agreement were disclosed, thus placing the general public on notice that Defendants had admitted culpability for Officer Frett's death. Thereafter, the People moved to reconsider the Court's oral Order of January 30, 2009 that it would enforce the plea agreement. The Motion was denied by Order dated February 20, 2009, whereupon the People petitioned the Supreme Court of the Virgin Islands to stay the Order and for expedited Writ of Mandamus. In an opinion filed May 13, 2009, the Supreme Court granted the Writ while dismissing as moot the Motion to Stay. The Supreme Court ruled, in effect, that the People had withdrawn the plea offer and Defendants had the option of accepting the People's offer to plead "Guilty" to "Voluntary Manslaughter" or proceeding to trial. This decision was also widely and, in at least one instance, sensationalistically, reported in the print and electronic media throughout the Territory and only served to further heighten public awareness of Defendants' admission of guilt for Officer Frett's death.

During the Hearing on June 4, 2009, the Parties announced that the Defendants had accepted the People's written plea offer to plead "Guilty" to "Voluntary Manslaughter." After conducting its examination pursuant to Rule 11 of the F. R. Cr. P., the Court rejected the plea agreement because a factual predicate therefor had not been established by the People.

37

## DISCUSSION

### I. Introduction

In a decision primarily based on the erroneous finding that the "trial court 'ignored clear, binding precedent from a court of superior jurisdiction' when it issued its January 30, 2009 Order"[5], the Supreme Court issued a Writ of Mandamus effectively mandating that the Court either enforce a plea offer not originally tendered by the prosecution or proceed to trial. Because either option would require the Court to condone blatant prosecutorial misconduct and deny Defendants their right to a fair and impartial jury trial, the Court will recuse itself from further consideration of this matter.

### II. Improper Issuance of Writ of Mandamus

■ According to the Supreme Court, "the trial court erroneously applied traditional contract law principles to the matter and found that specific performance was required because 'this was an oral offer' that was properly accepted and '[a] contract was therefore formed between the People and the Defendants with respect to the plea agreement' ". *Id.* Thus, Mandamus is "only appropriate 'to correct judicial action that is clearly contrary to well-settled law' ". *Id.* at 387.

■ In deciding to enforce the plea agreement, the Court based its decision on the law of this Territory that such an agreement is "contractual in nature and is to be analyzed under contract-law standards." *U.S. v. Moscahlaidis.*[6] 868 F2d 1357, 1361 (3d Cir. 1989) (citations omitted). *See*

---

[5] *In re People of the Virgin Islands*, 51 V.I. 374, 389 (V.I. 2009).

[6] While noting that the Court is bound by the decisions of the Third Circuit, the Supreme Court ruled that in rendering its decisions the decisions of the Third Circuit are merely persuasive. *See, In re People of the Virgin Islands, supra,* at 389, n.9. This ruling makes no sense. The Revised Organic Act of 1954, as amended, (48 U.S.C. § 1561 *et seq.*) is the Territory's constitution. Section 23 of the Act (48 U.S.C. § 1613) provides for the establishment of the V.I. Supreme Court and clearly states that *"for the first fifteen years following the establishment of the appellate court* authorized by Section 1611(a) of this title, *the United States Court of Appeals for the Third Circuit shall have jurisdiction to review by writ of ceriorari all final decisions of the highest court of the Virgin Islands from* which a decision could be had." (*emphasis added*) The V.I. Supreme Court was established in 2004 and commenced its operations in 2007. Based upon the plain language of Section 23, the U.S. Court of Appeals for the Third Circuit has been and continues to be the highest Court in the Territory, as least for the next ten (10) years. As such, its decisions are still binding precedent and will continue

*also*, *Henry v. Government of the Virgin Islands*, 340 F. Supp. 2d 583, 46 V.I. 341, 345 (D.V.I. App. Div. 2004)[7] ("as plea agreements are deemed contracts, the Court must resort to contract law in interpreting the agreement or in determining whether a breach occurred . . . In that regard, the Court must preliminarily determine whether the contract is unambiguous and, if so, interpret its meaning as a matter of law and give effect to its expert language."). The Court also, based upon the case law of the Territory,[8] determined that the Defendants had detrimentally relied on the People's plea offer when they accepted the offer and that acceptance and, *ergo*, their admission of guilt for Officer Frett's death was, within three (3) working days, widely publicized throughout the Territory and continues to be publicized, thus prejudicing Defendants' right to a fair and impartial jury trial.

Clearly, in light of the Court's reliance on binding authority in this Circuit in deciding to enforce the plea agreement, the Court was correct in applying "traditional contract law principles to the matter." Thus, the Supreme Court's conclusion that the Court erred in doing so makes no sense. While the Supreme Court may disagree with the Courts interpretation of those contract law principles, it certainly is not entitled, based on settled law in this jurisdiction, to conclude that such principles do not apply in considering whether plea agreements are enforceable in the Territory.

Similarly erroneous was the Supreme Court's conclusion that the "Court did not consider the settled law in this jurisdiction that the People had the unrestricted right to withdraw the plea offer prior to entry of the judgment accepting the plea, absent a finding of detrimental reliance." *In re People of the Virgin Islands, supra*, at 388-89, citing *Scotland, supra*. In fact, the Court did rely on *Scotland*, a fact admitted by the Supreme Court when it stated that the Court "did consider the issue of

---

to be so as a matter of law for both the Superior Court and the Supreme Court unless Congress determines otherwise.

[7] Prior to the establishment of the V.I. Supreme Court, the Appellate Division of the District Court of the V.I. served as the local Appellate Court.

[8] *Government of the Virgin Islands v. Scotland et al.*, 614 F.2d 360, 364, 17 V.I. 623 (3d Cir. 1980) (stating that the bargaining process has often been analogized to contract principles, that plea agreements are often likened to unilateral contracts and that specific performance will not be allowed for an unconsummated plea in the absence of detrimental reliance by the Defendant because a jury trial on the charge is an adequate remedy).

detrimental reliance in its February 20, 2009 Opinion and Order but did not perform such an analysis at the January 30, 2009 hearing when it issued its oral order requiring specific performance." *Id.* Again, in light of its own admission, the Supreme Court's conclusion makes no sense. According to the Supreme Court, "the detrimental analysis should have been made at the date it decided to enforce the plea agreement" *i.e.* January 30, 2009. *Id.* No authority is cited for this proposition.

Again, while the Supreme Court may disagree with the timing of the Court's detrimental reliance analysis, it is not entitled to conclude that such an analysis did not take place or, if it did, it must be performed at a particular time without citing any legal authority in support thereof and, based upon that conclusion, further conclude that the trial court ignored clear, binding precedent from a Court of superior jurisdiction when it issued its January 30, 2009 Order. *Id.*

In fact, given the case's procedural posture, there was nothing improper about conducting the detrimental reliance analysis after the Friday, January 30, 2009 Order. Specifically, after the latter Order granting Defendants' Motion for specific performance of the plea agreement and prior to the scheduled "Change of Plea" hearing on Monday, February 2, 2009, the Court became aware of *Scotland, supra*, and decided that it would have the parties brief the case prior to enforcing the plea agreement. The Court had every intention of informing the parties of its decision at the "Change of Plea" hearing on February 2, 2009. However, as noted heretofore, Attorney Bethel failed to appear at the hearing. When he appeared the following day, the Court advised the parties of its decision regarding *Scotland* and continued the Hearing pending submission and consideration of the briefs. See "Record of Proceedings," February 3, 2009. Attorney Bethel's arrest and release received Territory-wide media coverage by both print and electronic media on February 3rd and 4th, 2009. The media coverage included reports of the terms of the plea agreement and, *ergo*, Defendants admission of guilt for Officer Frett's death. These reports were based on "court documents" and interviews with Attorney Bethel. See, Defendants' "Memorandum of Law in Response to Reconsideration of the Granting of

the Emergency Motion on behalf of Basheem Ford to Enforce Plea Agreement", Exhibit B[9].

█ Based upon the virtually simultaneous widespread media coverage of Defendants' admission of guilt, the Court concluded that they could not get a fair trial and therefore determined, in light of the changed circumstances, that they had detrimentally relied on the People's plea offer.

While the Supreme Court was technically correct in concluding that the Defendants did not detrimentally rely on the People's plea offer as of January 30, 2009, it is clear that the validity of that offer and Defendants' acceptance thereof were part of an evolving rather than static process. As such, to conclude, as the Supreme Court does, that in performing its detrimental reliance analysis, the Court should have ignored that process and instead strictly adhere to a rigid deadline is to elevate form over substance and have the Court "bury its head in the sand like an ostrich" at the expense of that evolutionary process.[10]

█ In light of the foregoing, no credence can be accorded the Supreme Court's erroneous conclusions regarding the Court's alleged failure to adhere to legal precedent by applying contract principles in deciding the validity of the plea agreement or in performing its detrimental reliance analysis. Accordingly, the Court having correctly applied the law of the Circuit, there was nothing for the Supreme Court to correct by Mandamus, hence its issuance of the Writ was improper.

---

[9] The Court later issued a Press Release to clarify the willful misrepresentation of the People's Counsel that an arrest warrant was issued because he was "tardy," when he, in fact, willfully Ruled to appear as ordered.

[10] The Supreme Court's ruling is at odds with its own view that it is entitled to consider and, indeed, speculate about subsequent events in determining its appellate jurisdiction. *Id.* at 384. ("We must consider whether subsequent events may ripen the prematurely filed appeal . . .") ("In the event that the Defendants do not withdraw from the plea agreement . . . and the trial Judge accepts the plea agreement . . . the Superior Court will adjudicate the Defendants guilty . . . such a future Order would have the effect of dismissing all or part of the Information.") *Id.* Clearly, there is no rational basis for the Supreme Court to claim the right to consider and speculate about subsequent events in determining its appellate jurisdiction while denying the Court the right to consider such events in performing its detrimental reliance analysis, especially where, as here, those events are inextricably intertwined with Defendants' acceptance of the original plea offer and, *ergo*, their admission of guilt.

41

## III. Rejection of the Plea Agreement

Having erroneously premised its Writ of Mandamus on the Court's alleged failure to following binding precedent, the Supreme Court proceeded to effectively mandate that the Court consider the People's substituted offer to the Defendants to plead "Guilty" to "Voluntary Manslaughter." This offer was in fact accepted by the Defendants on June 4, 2009.

Under Virgin Islands law, "Manslaughter" is defined as "the unlawful killing of a human being without malice aforethought. It is of two kinds — (1) voluntary, upon a sudden quarrel or heat of passion: or (2) involuntary. . . ." Title 14 V.I.C. § 924. During the Court's examination of the parties, Attorney Bethel was asked to make a proffer to the Court as to what the evidence would show if the case were to go to trial. *See,* FED. R. CRIM P. 11(b)(3). As part of his proffer, Attorney Bethel stated that:

> Further inquiry into this matter, Your Honor, would also have shown that a gentleman by the name of Kurtis Baxter would have indicated *that Officer Frett had approached Basheem Ford earlier in this matter and had threatened him with what appeared to be an ax handle,* Your Honor. *And, according to the witnesses, pursued Basheem Ford into what was then known as the Universal Sports Bar where he admittedly initiated the aggression against Basheem Ford who at that time was believed to be unarmed. (emphasis added)*

After the proffer, the Court asked the Defendants whether they disagreed with what the prosecutor said. There was no response from either Defendant, whereupon the Court asked them to state what had happened on the day in question. Defendant Ford stated that he and his friend, Mr. Curtis Baxter, were the victims of unprovoked physical assaults by Officer Frett who "roughed up" Mr. Baxter and then struck Defendant Ford on his shoulder with a stick. Officer Frett then left, went to his home and retuned with his gun and stick. He began cursing at the Defendant and then an altercation ensued during which Officer Frett attempted to hit him again. He walked away and was met by his brother. Defendant Paris, who asked him what was the matter. Upon being told of the assault by Officer Frett, Defendant Paris told his brother to go home and continued walking in Officer Frett's direction. He knew Officer Frett

because he was his girlfriend's neighbor. As he walked towards Officer Frett, the latter turned and struck him on his left shoulder with his stick and thereafter struck him again as he walked away. A struggle ensued between Defendant Paris and Officer Frett during which Defendant Paris observed a weapon in the back of Officer Frett's pants. Defendant reached for the weapon and as they struggled for it, shots went off, Officer Frett was hit and died as a result thereof.

The Defendants' version of the incident is basically consistent with evidence placed in the record by the People. Specifically, in support of their "Motion for Stay and Petition for Expedited Writ of Mandamus. etc.," the People submitted People's Exhibit #12 which is a Memorandum dated September 5, 2008 from Attorney Bethel to Assistant Attorney General Douglas Dick, Acting Chief of the Criminal Division, requesting approval of a "propose[sic] Plea offer for Basheem Ford and Jermaine Paris." The Memorandum states in pertinent part:

. . .

> I am making this offer *after a careful review of the files* that show that additional witnesses . . . indicate that *Police Officer Frett initiated a deadly confrontation with the minor Defendant Basheem Ford by threatening and chasing him with an ax handle*, which unfortunately resulted in the death of Officer Frett by gunshots from the Defendants.

> Further problems with the case, such as a lack of a crime scene report and a lack of a crime scene ledger of items of evidence *as well as Officer Frett's history of violence and confrontations with The neighborhood youth* would lead me to . . . *seriously doubt if a verdict for more than the offense of voluntary manslaughter would be achieved in any event.* . . . (emphasis added)[11].

On page 2 of the Memorandum, in the space provided for "Approval," the word "yes" is handwritten and Attorney Dick's signature appears next to it. There is also a handwritten note that states "Wayne and Jesse must

---

[11] This is undoubtedly the same Memorandum Attorney Bethel attempted to introduce into evidence during the pre-trial conference on January 30, 2009 in support of his opposition to Defendants' "Motion to Enforce the Plea Agreement." Tr. Pgs. 18, 19. Assuming the document to be privileged, the Court ruled it inadmissible over Attorney Bethel's strenuous objection. Thus, the Court neither saw nor was aware of the contents of the Memorandum.

first discuss with Chief of Police before extending plea." "Wayne" presumably refers to Wayne G. Anderson, Esq., Special Counsel to the Attorney General, who, according to the Memorandum, was copied along with Attorney General Vincent F. Frazer.

■ In *Government of the Virgin Islands v. Knight*, 764 F. Supp. 1042, 1049, 26 V.I. 280 (D.V.I. 1991), the Court noted that the elements of "Voluntary Manslaughter" are: (1) the Defendant must have unlawfully killed another; (2) without malice aforethought; (3) upon a sudden quarrel or heat of passion; and (4) with either an intent to kill or an intention to inflict serious or grievous bodily injury that would likely cause or result in the victim's death. "In order to accept Defendant's plea of 'Voluntary Manslaughter,' the Court must have before it a factual basis as to each and every one of the four essential elements." *Id.*

With respect to the first element, it is highly unlikely that the People could prove beyond a reasonable doubt that Defendants aided and abetted each other in unlawfully killing Officer Frett.

Title 14 V.I.C. § 927 provides for "Justifiable Homicide" and states in pertinent part:

Homicide is justifiable when committed by —

. . .

(2) any person —

(A) when resisting any attempt to murder any person, or to commit a felony, or to do some great bodily injury about any person;
(B) when committed in defense of . . . person, against one who manifestly intends or endeavors, by violence or surprise to commit a felony . . .

■ The People have admitted that Officer Frett "initiated a deadly confrontation with the minor Defendant Basheem Ford by threatening him and chasing him with an ax handle." *See*, Mot. for Stay, etc. Exhibit #12. Officer Frett's conduct is consistent with the People's further admission that he had a "history of violence and confrontations with the neighborhood youth." *Id.* Given these facts and the Defendants' sworn testimony, both Defendants apparently had every right to "resist any attempt" by Officer Frett to either murder them, or "to commit a felony" *i.e.* at best Third Degree Assault in violation of 14 V.I.C. § 297(2)

(Assault with a deadly weapon) or do them "some great bodily harm." 14 V.I.C. § 927(2)(A). Furthermore, Officer Frett's death appears to have resulted from both Defendants defending themselves and each other "against one who manifestly intend[ed] or endeavor[ed], by violence . . . to commit a felony . . ." 14 V.I.C. § 927(2)(B). That Defendants appear to have acted justifiably is consistent with the People's admission that the deadly confrontation initiated by Officer Frett "unfortunately resulted in [his] death by gunshot from the Defendants." *See* People's "Mot. For Stay, etc." Exhibit #12.

██ Additionally. Defendants also, based upon the People's admission, appear to have acted in self-defense pursuant to 14 V.I.C. § 43. *See, Sanchez v. Gov't of the Virgin Islands*, 921 F. Supp. 297, 301, 34 V.I. 105, 110 (D.V.I. App. Div. 1996). ("if the Defendant was not the aggressor and had reasonable grounds to believe and actually did believe that he was in imminent danger of death or serious bodily harm from which he could save himself only by using deadly force against his assailant, he had the right to apply deadly force to protect himself. By deadly force is meant force which is likely to cause death or serious bodily harm.") The Appellate Division further reasoned that "the circumstances under which the Defendant acted must have been such as to produce in the mind of a reasonably prudent person similarly situated, the reasonable belief that the other person was then about to kill him or do him serious bodily harm. In addition, the Defendant must have actually believed that he was in imminent danger of death or serious bodily harm that deadly force must be used to repel it."

When considered in light of the foregoing, the factual predicate proffered by the People failed to establish that Officer Frett's death was unlawful or that Defendants unlawfully killed him.

With respect to the remaining elements of the offense, while it can reasonably be concluded that the Defendants acted without malice aforethought, there does not appear to have been any "sudden quarrel" between Officer Frett and the Defendants based upon the People's admission. Specifically, the "initiat[ion] of a deadly confrontation with the minor Defendant Basheem Ford by threatening and chasing him with an ax handle" is inconsistent with any "sudden quarrel" between him and Officer Frett. Furthermore, Defendant Ford testified to walking away after the unprovoked assault on him by Officer Frett. Similarly, the sworn testimony of Defendant Paris with respect to what transpired when he

45

encountered Officer Frett immediately following the latter's assault against Defendant Ford does not indicate that any quarrel occurred between himself and Officer Frett prior to him being assaulted by the Officer. Moreover, any sudden "heat of passion" is again belied by the People's admission of the initiation of a deadly confrontation by Officer Frett which "unfortunately resulted in [his] death." Thus, the People failed to establish that Officer Frett's death resulted from Defendants' participation in any "sudden quarrel or heat of passion."

♦ The final element of "Voluntary Manslaughter" requires that the Defendants either had the specific intent to kill Officer Frett or inflict serious or grievous bodily harm that would likely cause or result in his death. Again, as with the elements discussed heretofore, given the People's own admission about the circumstances surrounding the Officer's death and the testimony of the Defendants, it cannot reasonably be concluded that the Defendants had the specific intent to kill Officer Frett, especially where, as here, their conduct appears to fall within the purview of 14 V.I.C. §§ 43 and 927.

The People having failed to establish three (3) of the four (4) elements of "Voluntary Manslaughter," the Court could not accept the Defendants' Plea of "Guilty" to that offense and thus was constrained to reject the plea agreement.

## IV. Proceeding to trial in the face of blatant prosecutorial misconduct would be a travesty of justice and a fraud upon the Court.

Having rejected the plea agreement, the only other option, according to the Supreme Court, was to proceed to trial of the matter. Such a trial, however, would be a travesty of justice and a fraud upon the Court.

### (a) Lack of sufficient evidence to support conviction for overwhelming majority, if not all, of charges.

In *Berger v. United States*, 295 U.S. 78, 88, 55 S. Ct. 629, 79 L. Ed. 1314 (1939), the U.S. Supreme Court stated that:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose *obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.* As such, he is in a peculiar

46

and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor-indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. *It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.* (emphasis added)

From the inception of this matter, the People knew "that witnesses stated that they observed the deceased, Ariel Frett, chasing a minor 'B.F.' with a wooden stick on Prindsens Gade," locally known as 'Goat Street'; "that witnesses stated that the minor's brother, Jermaine Paris, came out of the alley east of the Fabric Store on Prindsens Gade . . . [and] Ariel Frett struck him with the stick and a struggle ensued between the two men . . . [which] lasted approximately five minutes." *See*, Affidavits of Detective Cpl. Mario Stout dated January 31, 2008 and March 6, 2008 in support of the arrest warrants for Basheem Ford and Jermaine Paris, respectively. Detective Stout's sworn statements were later corroborated by Attorney Bethel "after a careful review of the files." *See*, People's "Mot. to Stay, etc." Exhibit #12. Based upon these documents, it is clear that at all times relevant herein, the People knew that they could not reasonably sustain their burden of proving beyond a reasonable doubt that Defendants "unlawfully kill[ed]" Officer Frett with "malice aforethought" with respect to Counts One, Two, Three, Twelve, Thirteen and Fourteen of the "Consolidated Information" charging them with aiding and abetting each other in committing First and Second Degree Murder and crimes relative thereto.[12] Indeed, the People have admitted to having "serious doubt" of obtaining a verdict for more than "Voluntary Manslaughter." *Id.*

Despite their knowledge and "serious doubt." the People have to date failed to move for dismissal of the above-mentioned six (6) Counts of the "Consolidated Information." Instead, in clear violation of their legal and ethical obligation to see "that justice shall be done,"[13] they have

---

[12] "Murder" is defined as "the unlawful killing of another with malice aforethought." 14 V.I.C. 921.

[13] *Berger v. United States, supra. See also*, Standard 3-3.9(a) of the ABA's "Standards for Criminal Justice: Prosecutor Function and Defense Function." Third Edition ["a prosecutor should not institute, cause to be instituted, or permit the continued pendency of criminal charges in the absence of sufficient admissible evidence to support a conviction."]

unequivocally stated their "prepared[ness] to go forward for trial" on these Counts as recently as March 9, 2009 and June 5, 2009. *See*, People's "Mot. to Stay. etc." Pg 6 and *Corliss Smithen, "Plea Deal for Accused Killers of Police Officer Falls Apart," Daily News, June 5, 2009*, respectively. More importantly, as of this writing they have not moved to dismiss any of the charges in the "Consolidated Information."

Similarly, with respect to the remaining 16 Counts of the "Consolidated Information," four (4) charge the Defendants with aiding and abetting each other in committing "Voluntary Manslaughter" and "Unauthorized Use of a Firearm" in connection therewith and four (4) charge them with aiding and abetting each other in committing "First Degree Assault" and "Unauthorized Use of a Firearm" in connection therewith. As discussed heretofore, during the "Change of Plea" hearing on June 4, 2009, the People failed to establish that the Defendants committed the crime of "Voluntary Manslaughter" and as such they will, in all likelihood, be unable to meet their burden of proof at trial with respect to that offense and the weapons charges associated therewith. With respect to "First Degree Assault," this offense requires proof that Defendants, with the intent to commit murder, assault[ed]" Officer Frett. 14 V.I.C. § 295(1). Again, as noted heretofore, given the People's admission of the circumstances surrounding Officer Frett's death and their "serious doubt" about obtaining a conviction for this offense, it is highly unlikely that they will be able to meet their burden of proof at trial that Defendants assaulted Officer Frett with the "intent to murder — him and the weapons charges in connection therewith, especially where, as here, Defendants' actions appear to have been justified pursuant to 14 V.I.C. §§ 43 and 927.

As with the Murder counts and related charges, the People to date have publicly stated their "prepared[ness] to go forward for trial, on the 'Voluntary Manslaughter' and 'First Degree Assault' counts and weapons offenses in connection therewith, despite having 'serious doubt' and their clear inability to meet their burden of proof at trial." Of the remaining eight (8) Counts which charge Defendants with aiding and abetting each other in committing "Third Degree Assault" and "Unauthorized Possession of a Firearm" in connection therewith, four (4) of these Counts lack probable cause. Specifically, probable cause was never found to support these Counts which allege that the Defendants assaulted one Mr. Carlos Williams with a deadly weapon and used an unlicensed firearm

48

in connection therewith. *See* Det. Stout's Affidavits in support of arrest warrants, *supra*, and Transcript of "Advice of Rights and Probable Cause Hearing," March 7, 2008.

The final 4 Counts Charge the Defendants with aiding and abetting each other in the Third Degree Assault of Officer Lorne Clark and possession of an unlicensed firearm in connection therewith. Based upon the People's own admission that "after a careful review of the files, they seriously doubt if a verdict for more than the offense of voluntary manslaughter could be achieved in any event,"[14] the conclusion is warranted that, as with the other 18 Counts the People would, in all likelihood, be unable to meet their burden of proof at trial with respect to these four (4) Counts.

█ In light of the foregoing, the People's stated "prepared[ness] to go forward for trial" on the "Consolidated Information" appears to be mere posturing for public consumption rather than the product of any plausible belief of reasonably obtaining convictions of the Defendants at trial. Indeed, it is not easily understood how, in light of the record before it, especially People's Exhibit #12, the Supreme Court could, in effect, endorse an offer by the People to Defendants to plead "Guilty" to "Voluntary Manslaughter" or, even more importantly, mandate a trial of this matter. Clearly, any such trial in light of the record herein would be in clear violation of law, the principles enunciated in *Berger, supra*, and Rule 3.8 of the Model Rules of Professional Conduct. More importantly, such a trial would be tantamount to perpetrating a fraud upon the Court and a travesty and perversion of justice This Court cannot and will not be a party to such egregious misconduct.

### (b) Recusal Based Upon Numerous False Statements by Prosecutor

Title 4 V.I.C. § 284 provides for "Disqualification of Judge" and states in pertinent part:

No judge shall sit or act as such in any action or proceeding:

. . .

(4) When it is made to appear probable that, by reason of bias or prejudice of such judge, a fair and impartial trial cannot be had before him.

---

[14] People's "Mot. for Stay, etc." Exhibit #12.

49

Based upon the repeated false statements[15] made by Attorney Bethel in this matter, both before this Court and the Supreme Court, the presumption of regularity with which prosecutors normally are cloaked upon appearing in Court as representatives of the People, can no longer be accorded the People's Counsel and, thus, this Court will be unable to accord much credence to any further representations by him in this matter.

Specifically, in their "Motion for Stay, etc," Attorney Bethel made the following false and misleading statements:

1. "The alleged homicide '*indisputably* occurred as a result of multiple *intentional* gunshot wounds.' " People's "Mot. for Stay, etc." Pg 1. This statement is knowingly false because, as the record indicates, and as noted earlier in Exhibit #12, Attorney Bethel knew that Officer Frett's death resulted from a deadly and unprovoked confrontation initiated by him with the minor Defendant, Basheem Ford. Coupled with his own admission of "serious doubt" in obtaining convictions for the numerous specific intent crimes charged in the "Consolidated Information", it is highly unlikely that the homicide "indisputably" resulted from multiple "intentional" gunshot wounds as he states.

2. "The undersigned Assistant Attorney General arrived approximately ten (10) minutes late with the Notice of Appeal in-hand, the Court recessed prior to the undersigned Attorney's arrival and the Court refuse [sic] to reconvene or even hear what should have been characterized as excusable tardiness . . ." People's "Mot. for Stay, etc." Pg 6.

This statement is also false. Contrary to his "ten minutes late" mantra, the "Record of Proceedings" for February 2, 2009 reflects that Court convened at 4:15 p.m. due to Attorney Bethel's failure to appear at 4:00 p.m., the scheduled time of the hearing. Moreover, he could not have arrived 10 minutes late with the "Notice of Appeal in hand" when the

---

[15] In addition to the false statements noted herein, given the exculpatory-nature of the information referenced in People's Exhibit No. 12, Attorney Bethel was obligated to disclose same to Defendants as part of his discovery obligations. *See, Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). Notwithstanding this obligation, he never did so. despite his repeated written statements to the Court. ("The People are presently unaware of any exculpatory material other than as noted above." 6/29/2008, 7/2/2008, 7/29/2008, 9/9/2008, 9/18/2008) ("The People know of no evidence that would tend to demonstrate that the Defendant Ford was not involved in the illegal activities charged in the Consolidated Information"; "all relevant discoverable information has been provided to the Defendant or will be provided . . . by July 18, 2008." 6/27/2008.)

document is date stamped February 2, 2009, 4:55 p.m. *See, "Notice of Appeal."* Also, the Court never "recessed" but adjourned for the day since there were no other matters scheduled after 4:00 p.m. Once Court was adjourned for the day, it could not, as a matter of law, "refuse to reconvene" that day to hear Attorney Bethel's "excusable tardiness." More importantly, there was no "excusable tardiness" because Attorney Bethel stated in the very Motion that "at the January 30, 2009 Hearing [he] stated that *he would not be appearing for the Change of Plea Hearing." (emphasis supplied). Id.* Indeed, he publicly repeated his intention[16] and conveyed it to at least one other Attorney. Attorney Bethel only appeared at Court after being informed that a warrant had been issued for his arrest, at which time he was promptly arrested because of his willful failure to appear as ordered and remanded into custody, the Court having adjourned for the day.

3. "Because the trial Court participated in the plea negotiation directly on January 30, 2009 by not only reviewing what transpired orally between the parties but mandating what the plea agreement should be in its entirety . . . ." People's "Mot. for Stay, etc." Pg 8.

This statement is false. The Court never directly or indirectly participated in any plea negotiation between the parties. The record is clear that on January 16, 2009, Attorney Bethel orally offered Defendants a plea to "Involuntary Manslaughter." See. Defs' "Motion to Enforce Plea Agreement," *supra.* This offer was orally accepted by the Defendants on January 26, 2009. *Id.* As a matter of basic contract law, by accepting the offer, an agreement was entered into by the parties and any "negotiation" by them with respect thereto had ended. As noted heretofore, when Attorney Bethel attempted to withdraw the offer, Defendants moved to enforce the plea agreement. The Motion was heard on January 30, 2009, at which time, the Court, because Attorney Bethel virtually denied that he had made the offer or, if he did, he "misspoke," granted the request of Attorney Hogroian to retrieve his voice mail of the plea offer. Attorney Bethel was clearly and unambiguously heard to offer Defendants a plea to "Involuntary Manslaughter". Being fully aware that as a veteran prosecutor and lawyer, Attorney Bethel knew the difference between "Voluntary" and "Involuntary Manslaughter," the Court was satisfied that

---

[16] *See,* Fn 24, *Infra.*

an oral contract was formed by the parties and ruled that the agreement was enforceable. *See, Moscahlaidis, supra,* and *Scotland, supra.* Accordingly, the matter was scheduled for a "Change of Plea Hearing." Because the plea agreement had already been negotiated prior to the Motions to enforce it and the Court listening to the offer on voice mail, to characterize the Court's decision to satisfy itself that the parties had an oral agreement by listening to the offer as "direct" participation in the plea negotiation is a blatant falsehood.

4. On pages 9, 10 and 11 of the "Motion to Stay, etc.," Attorney Bethel repeats his false statement about the Court's "participation" / "intervention" in the parties' plea negotiation.

5. "The arrest warrant . . . for being late by 10 minutes . . . is a pretext under the circumstances to sanction the Assistant Attorney General for objecting to the trial court's Change of Plea Hearing. . ." *Id.*

██ This statement is false. As noted heretofore, the warrant was issued solely because of Attorney Bethel's willful failure to appear as ordered for the hearing. The issuance of the warrant was authorized by law. See 4 V.I.C. § 243 ("Every court shall have power . . . (4) to compel obedience to its . . . orders and process . . ."). See, also 4 V.I.C. § 244 ("any person who willfully violates . . . or refuse to observe or perform any lawful order of a Court shall be guilty of contempt . . ."). Until his appeal was properly noticed, Attorney Bethel was required to comply with the Court's order to appear at the "Change of Plea" hearing. At the time of adjournment and issuance of the warrant, no Notice of Appeal had been filed with the Court and one was not filed until after Court adjourned on February 2, 2009.

██ The above false statements are in clear violation of Rules 3.3[17],

---

[17] Rule 3.3 of the Model Rules of Professional Conduct states: "(a) a lawyer shall not knowingly: (1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer." The "Comment" to the Rule states that: "(2) this sets forth the special duties of lawyers as officers of the Court to avoid conduct that undermines the integrity of the adjudicative process . . . the lawyer must not allow the tribunal to be misled by false statement of law or fact or evidence that the lawyer knows to be false."

$3.8^{18}$, $8.2^{19}$ and $8.4^{20}$ of the Model Rules of Professional Conduct.

██ When viewed in light of the foregoing Rules, it is clear that the aforementioned statements presented to the Supreme Court by Attorney Bethel and those presented to this Court as noted heretofore are not only in violation of those Rules but they also serve as a basis for this Judge to henceforth doubt his credibility and view any further representations by him with much skepticism and for what they are i.e. more falsehoods aimed at simply trying to "win a conviction rather than seeing that justice is done." Because of Attorney Bethel's demonstrable proclivity for falsehood and misrepresentation, this Court, in all probability, will be unable to afford his client. the People of the Virgin Islands, a fair and impartial trial of this matter.

## V. A trial in the face of widespread media publicity regarding defendants admission of Guilt for Officer Frett's death would deny Defendants their 6th amendment right to a fair and impartial jury

### (a) Extensive pre-trial publicity prevents Defendants from receiving a fair trial in the Territory.

Despite the deference that should be accorded a trial cour with respect to its factual findings, the Supreme Court held that the Court could not find juror partiality based solely upon the extensive pre-trial publicity surrounding Defendant's acceptance of the People's plea offer to "Involuntary Manslaughter" and, *ergo*, their admission of culpability for Officer Frett's death. *See In re People of the Virgin Islands supra,* at 389. Rather, the Court was required to conduct a *voir dire* of the jury to ascertain whether it had been exposed to extra record information and the nature of that Information." *Id* at 391.

██ The U.S. Supreme Court "has long recognized that adverse publicity can endanger the ability of a Defendant to receive a fair trial."

---

[18] Rule 3.8 states that "the prosecution in a criminal case shall: (a) refrain from prosecuting a charge that the prosecutor knows is not supported by probable cause."

[19] Rule 8.2(a) provides that "a lawyer shall not make a statement that the lawyer knows to be false or with reckless disregard to its truth or falsity concerning the . . . integrity of a Judge . . ."

[20] Rule 8.4 states that it is professional misconduct for a lawyer to: (a) violate or attempt to violate the Rules of Professional Conduct . . . (b) engage in conduct involving dishonesty, fraud, deceit or misrepresentation; (d) engage in conduct that is prejudicial to the administration of justice . . ."

*Gannett Co. Inc. v. DePasquale*, 443 U.S. 368, 378, 99 S. Ct. 2898, 2904, 61 L. Ed. 2d 608 (1979). (*citations omitted*). According the Court, *"publicity concerning the proceedings at a pre-trial hearing, however, could influence public opinion against a Defendant and inform potential jurors of the inculpatory information wholly inadmissible at the actual trial." Id. (emphasis added)*. The Court further noted that "the danger of publicity concerning pretrial [] hearings is particularly acute because *it is difficult to measure with any degree of certainty the effects of such publicity on the fairness of the trial." Id. (emphasis added)*. While acknowledging that "inadmissible prejudicial information about a defendant can be kept from a jury by a variety of means", the Court went on to state:

> *When such information is publicized during a pre-trial proceeding, however, it may never be altogether kept from potential jurors. Closure of pre-trial proceedings is often one of the most effective methods that a trial judge can employ to attempt to insure that the fairness of a trial will not be jeopardized by the dissemination of such information throughout the community before the trial itself has even begun. (emphasis added)*

*Id.*

■■■■ Additionally, in *Sheppard v. Maxwell*, 384 U.S. 333, 351, 186 S. Ct. 1507, 1516, 16 L. Ed. 2d 600 (1966) the U.S. Supreme Court noted that "we set aside a federal conviction where the jurors were exposed 'through news accounts' to information that was not admitted at trial." *Id.*, citing *Marshall v. United States*, 360 U.S. 310, 79 S. Ct. 1171, 3 L. Ed. 2d 1250 (1959). Continuing, the Court noted that "we held that the prejudice from such material may indeed be greater' than when it is part of the prosecutor's evidence 'for it is then not tempered by protective procedures'." The Court further stated:

> "We did not consider dispositive the statements of each juror 'that he would not be influenced by the news articles that the could decide the case only on the evidence of record, and that he felt no prejudice against petitioner as a result of the articles.' "

*Id*, citing *Marshall* at 312, 79 S. Ct. 1173. Finally, the Court noted that "likewise, in *Irvin v. Dowd*, 366 U.S. 717, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961),

*even though each juror indicated that he could render an impartial verdict despite exposure to prejudicial newspaper articles, we set aside the conviction." Id. (emphasis added)*

 "It has been properly observed that what we know as men, we should not ignore as Judges." *Domeracki v. Humble Oil and Refining Co.*, 443 F.2d 1245, 1251 (3d Cir. 1971).

We know that the Territory comprises a total geographic area of approximately 136 square miles (St. Croix, 84 sq. miles; St. Thomas, 32 sq. miles; St. John, 19 sq. miles; and Water Island, .76 of a sq. mile). Its total population is approximately 109,000. The victim was not an ordinary victim but a veteran Police Officer and the scion of a prominent V.I. Family. Because of his status, any news with respect to his violent death and those accused thereof, especially their admission of guilt, would undoubtedly generate heightened scrutiny and interest throughout the Territory.

In its February 20, 2009 Order, the Court, relying on *Scotland, supra*, held that "[w]hen viewed in light of the Territory's small population and the wide-spread media accounts of the plea agreement and *ergo*, Defendants' effective admission of culpability for the killing of the victim, the Court finds that the resulting prejudice to *any potential jury pool in the Territory* precludes the selection of a fair and impartial jury for Defendants." *People v. Ford*, Super. Ct. Crim. Nos. 76/2008, 109/2008, 2009 WL497686, Pg. 4. (Super. Ct. Feb. 20. 2009) *(emphasis added)*.

 The Court based its finding of substantial pre-trial prejudice on evidence that was in the record, including articles appearing in the Virgin Islands Daily News, the St. Thomas source and the St. John Source[21]. See Def's *"Memorandum of Law in Response to Reconsideration of the Granting of the Emergency Motion on Behalf of Basheem Camal Ford to Enforce Plea Agreement."* Exhibit B[22]. Furthermore, and again contrary to the Supreme Court's ruling, the fact of the media reports, including

---

[21] Molly Morris, *Prosecutor Released After Getting Jailed for Being 10 Minutes Late*, St. John Source, February 3, 2009 (internet periodical); Aldeth Lewin, *Kendall jails tardy assistant attorney general*, Virgin Islands Daily News, February 3, 2009, at 3; Aldeth Lewin, *Judge releases prosecutor*, Virgin Islands Daily News, February 4, 2009 at 5.

[22] In its opinion, the Supreme Court erroneously held that the Court did not take judicial notice of media reports and "premised its entire analysis on multiple newspaper articles. . .that were not entered into the record by the parties." *In re People of the Virgin Islands, supra*, at 389-90. Had the Supreme Court reviewed "Defendant's Memorandum of Law in

those referred to in Exhibit B, were capable of being judicially noticed even though the Court did not go on record as doing so. See F.R.E. Rule 201(c) ["*A court may take judicial notice, whether requested to or not.*"] *and (f)* ["*Judicial notice may be taken at any stage of the proceeding.*"] The "note to subdivision (f) states that "in accord with the usual view, judicial notice may be taken at any stage of the proceeding, whether in the trial Court or on appeal." It is thus clear that even though the fact of the widespread media coverage may not have been formally noticed by the Court, there is no reason why either the Court or the Supreme Court could not have taken such notice as a matter of law. Accordingly, the Court did rely on evidence in the record and therefore there is no merit to the Supreme Court's finding that the Court "acted contrary to clear binding precedent from the United States Supreme Court and the Third Circuit when it premised its decision on evidence not in the record." *In re People of the Virgin Islands, supra*, at 391-92. Indeed, once again, the Supreme Court's ruling makes no sense. Even as it states that the Court "premised its decision on evidence not in the record," It refers to that very evidence when it "note[s] that the trial Judge found that '[t]he aforementioned articles appear[ed] in the Virgin Islands Daily News, the St. Thomas Source and the St. John Source' and that these publications were 'three of the most prominent media sources in the Territory'." *In re People of the Virgin Islands, supra*, Fn II (*emphasis added*). Inasmuch as the People appealed the Court's Order denying their Motion to Reconsider, that Order included Defendants' response to the Motion which included their Exhibit B. This Exhibit was clearly part of the record before the Court and on appeal, so that the Supreme Court had to have known that it was relied upon by the Court in its Order denying the Motion when it "found that '[t]he aforementioned articles appeared in the Virgin Islands Daily News, etc'."

Moreover, none of the cases cited by the Supreme Court to support its finding that the Court was required to conduct a *voir dire* of the jury to

Response to Reconsideration of the Granting of the Emergency Motion on Behalf of Basheem Carnal Ford To Enforce Plea Agreement," filed on February 6, 2009, it would have noted that the subject articles appear as Exhibit B. Additionally, Defendants correctly noted on page 5 of their Memoranda of Law in response to reconsideration of the granting of the emergency motions on behalf of Defendants to enforce plea agreements that TV2, one of only two (2) local news broadcasts in the Territory, broadcasted reports detailing Defendants' desire to plead "Guilty" to "Involuntary Manslaughter."

determine the degree and nature of their exposure to the pre-trial publicity applies here. *See In re People of the Virgin Islands, supra*, at 391. Specifically, none involved a Defendant who had effectively admitted guilt prior to trial. None involved the admission of such guilt for the death of a veteran and prominent Police officer. None involved the admission of such guilt in a very small Territory surrounded by water and with an equally small population. None included the widespread publicity surrounding such an admission in such a small Territory and the heightened scrutiny that would naturally attend such an admission given the high profile nature of the crime and the victim. Because it failed to appreciate that it was considering a "clean slate" here in the Territory, the Supreme Court relied on authority that was wholly inapposite.

 As noted by the U.S. Supreme Court, a *voir dire* of the jury, especially in such a small Territory, would not ensure that each juror "would not be influenced by the news articles, that he could decide the case the case only on evidence in the record, and that he felt no prejudice against [the Defendants] as a result of the articles." *Sheppard v. Maxwell, supra* 86 S. Ct. 1516. Nor would such a *voir dire* necessarily "measure with any degree of certainty the effects of such publicity on the fairness of the trial." *Gannett Co. Inc. v. Depasquale, supra*, 99 S. Ct. 2904.

Moreover, the Defendants' admission of guilt occurred in a pre-trial proceeding. As such it "may never be altogether kept from potential jurors." *Id.* Additionally, because of the inculpatory nature of Defendants' admission of guilt which is totally inadmissible at trial[23] "publicity concerning [the admission] [could influence public opinion against [the] Defendant[s] and inform potential jurors of the inculpatory information wholly inadmissible at the actual trial." *Id.*

Consistent with the U.S. Supreme Court's pronouncements, the Court did employ "one of the most effective methods . . . to ensure that the fairness of [the] trial will not be jeopardized by the dissemination of such information throughout the community before the trial has even begun" i.e. closure of the pre-trial proceedings. *Id.* In fact, the January 30, 2009 pre-trial conference where the terms of the Plea agreement were disclosed

---

[23] See, FED. R. EVID. 410 ("[E]xcept as otherwise provided in this Rule, evidence of the following is not, in any . . . criminal proceeding, admissible against the Defendant who made the plea or was a participant in the plea discussion: (4) a plea of guilty which was later withdrawn."

and the decision made to enforce that agreement was held in Chambers. The terms of the plea agreement and Defendants admission of guilt only became public when Attorney Bethel was arrested and incarcerated because of his willful failure to appear at the "Change of Plea" hearing. As noted heretofore, in an interview with the media upon his release, he disclosed the terms of the plea agreement and, *ergo*, Defendants' admission of guilt, in an attempt to justify his "tardiness[24]." Because any further attempt at closure of any other pre-trial proceeding would be tantamount to "closing the barn door after the horse has gone," this method cannot be utilized to ensure fairness of the trial.

In light of the foregoing, a trial of the matter would be a violation of the Defendants' 6th Amendment right to a fair and impartial jury and this Court's obligation to uphold that right.

### (b) The curative measures suggested by the Supreme Court are not available to Defendants

The Supreme Court stated that the Court should have considered other curative measures such as change of venue. *In re People of the Virgin Islands, supra*, at 391-92. In its Order of February 20, 2009 and based upon the unique circumstances presented in this case, the Court considered and rejected a change of venue as a curative measure[25]. In the absence of any showing by the Supreme Court that that finding was clearly erroneous, the Supreme Court should have deferred to the Court's findings relative thereto as the fact finder in this matter.

The Supreme Court also concluded that the Court could continue the matter until the threat abates. *Id.* (citing *Sheppard v. Maxwell*, supra at 86 S. Ct. 1507, 1522). The Court is unable to reconcile such conduct with upholding Defendants' right to a speedy trial, a right which neither Defendant has waived. See, U.S. CONST. amend. VI. ("[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public

---

[24] See Aldeth Lewis, *Judge Releases Prosecutor*, Virgin Islands Daily News, February 4, 2009. Pg. 5 ("Bethel maintains that the Government's plea offering was for voluntary manslaughter . . .") ("Bethel said he told Kendall on Friday that he would not be at Monday's hearing because that would mean the Involuntary Manslaughter plea would be accepted.")

[25] Clearly, the Virgin Islands cannot be compared to any state or large metropolitan area in the United States of America where pre-trial publicity of the kind herein can be localized, thereby facilitating a change of venue.

trial[.]"). Thus, constantly continuing this matter to avoid substantially prejudicial pre-trial publicity would surely be contrary to the well-settled law in the United States.

Moreover, it does not appear that the threat will abate. Constant media attention is assured given the high profile nature of the case in the Territory. As noted heretofore, the threat was exacerbated on May 13, 2009 when the Supreme Court issued its Opinion. The resulting news reports came almost three (3) months after the Court rendered its Order on February 20, 2009. Thus, it appears that the curative measure of continuance is also unavailable to Defendants due to the media attention that has been garnered and will continue to be garnered by these proceedings.

## CONCLUSION

It is axiomatic that the Writ of Mandamus is an Extraordinary Writ which is issued only in those limited situations when the relief sought is extraordinary. Where, as here, the Writ was apparently sought and issued to facilitate the Prosecution's blatant misconduct and perpetrate a fraud on the Court, such relief can hardly be deemed to be ordinary, much less extraordinary. Indeed, it is contrary to law and all notions of justice.

Moreover, inasmuch as the Court made its decision to enforce the original plea agreement based on well-settled principles enunciated by the U.S. Supreme Court and the Third Circuit, the Supreme Court clearly erred in its conclusion that the Court failed to do so because it failed to recognize and appreciate the unique facts presented in this case. Because the Writ was premised on this and other erroneous conclusions, its issuance was clearly improper. However, assuming, *arguendo*, it was properly issued, to effectively mandate that this Court preside over a trial in the face of blatant and widespread prosecutorial misconduct bordering on criminality is to mandate that it violate its legal and ethical obligations. Such a violation is compounded by the virtual denial of Defendants' 6th Amendment right to trial by a fair and impartial jury because the widespread publicity that resulted and continues to result from Defendants' admission of guilt for Officer Frett's death, has virtually foreclosed the selection of such a jury in this very small population.

For all of the foregoing reasons, the Court will recuse itself from further consideration of this matter. An appropriate Order is attached.

**ORDER**

In accordance with the Memorandum Opinion of even date, it is hereby

**ORDERED** that, pursuant to Title 4 V.I. CODE ANN § 284 (4), the undersigned **RECUSES** himself from the above-captioned matter and returns same to the Clerk of the Court for reassignment.

**ORDERED,** that a copy of this Order shall be served upon Defendants, Mr. Jermaine Shamory Paris and Mr. Basheem Carnal Ford, and copies directed to Assistant Attorney General Jesse Bethel, Territorial Public Defender Samuel Joseph and Attorney Steven Hogroian.