OPINION
(April 3, 2013)
SMITH, Circuit Judge
As Alexander Hamilton famously explained, courts have “no influence over either the sword or the purse.” The Federalist No. 78 (Alexander Hamilton). They have “neither FORCE nor WILL but merely judgment.” Id. Except for the persuasiveness of their decisions, courts can compel obedience to their orders only through their inherent power of contempt. Int’l Union of United Mine Workers of Am. v. Bagwell, 512 U. S. 821, 831, 114 S. Ct. 2552, 129 L. Ed. 2d 642 (1994) (describing the “inherent contempt authority” as a power “necessary to the exercise of all otherQ” judicial powers (quoting United States v. Hudson, 11 U.S. (7 Cranch) 32, 34, 3 L. Ed. 259 (1812))). The contempt power, however, is limited to “those instances where the court must vindicate its authority.” Waste Conversion, Inc. v. Rollins Envtl. Servs., 893 F.3d 605, 612 (3d Cir. 1990). It is “not made for the protection of judges who may be sensitive to the winds of public opinion. Judges are supposed to be [people] of fortitude, able to thrive in a hardy climate.” Craig v. Harney, 331 U.S. 367, 376, 67 S. Ct. 1249, 91 L. Ed. 1546 (1947).
After the Virgin Islands Supreme Court issued a writ of mandamus in a criminal case presided over by former Superior Court Judge Leon A. *723 Kendall, he published an opinion chastising the mandamus decision and recusing himself from the case due to alleged prosecutorial misconduct. The Justices cited Kendall for criminal contempt and eventually found him guilty because his opinion, in their view, obstructed the administration of justice and because his recusal was pretextual in that he sought to avoid complying with the writ of mandamus.
Kendall asks us to reverse his convictions. He argues that his judicial opinion is protected by freedom of speech and cannot therefore serve as a basis for criminal contempt. As to that novel question, we hold that the First Amendment protects a sitting judge from being criminally punished for his opinion unless that opinion presents a clear and present danger of prejudicing ongoing proceedings. Kendall’s opinion did not pose such a threat. We also agree with Kendall that there is insufficient evidence that his recusal was pretextual. Consequently, we will reverse the Virgin Islands Supreme Court’s judgment and vacate all of Kendall’s contempt convictions.
I

A.

The Underlying Criminal Case

Kendall’s criminal-contempt convictions arose from actions he took while presiding over People v. Ford, a criminal trial of Basheem Ford and Jermaine Paris for killing an off-duty police officer. See generally 52 V.I. 30 (V.I. Super. Ct. 2009). The prosecutor, Assistant Attorney General Jesse Bethel, Jr., initially charged Ford and Paris with manslaughter (among other crimes) in January 2008 but later added charges of first-degree assault and first- and second-degree murder.
Bethel subsequently expressed “serious doubt” to his supervisor about whether he could successfully convict Ford and Paris of more than voluntary manslaughter. Although he later admitted that his prosecutorial duties required him not to pursue charges about which he had “serious doubt[s],” Bethel left the murder charges pending and began plea negotiations with counsel for Ford and Paris.
On January 16, 2009, Bethel left a voicemail with the defendants’ counsel that offered Ford and Paris a plea bargain to involuntary manslaughter in exchange for dismissal of the remaining charges — an offer they accepted ten days later. Bethel then reversed course, claiming that he had offered a plea deal to voluntary manslaughter and denying that *724 any plea deal existed for involuntary manslaughter. People v. Ford, 52 V.I. 30 (V.I. Super. 2009) (depublished). Ford and Paris each moved to enforce the involuntary-manslaughter offer. During argument on the motions before Kendall, Bethel said that even though he might “have misspoken” or the defendant’s counsel may have “misunderstood” the deal, he also insisted that he “made it very clear” that “the deadline to respond [to the offer]” was January 26,2009, and that the defendants had not done so. But a voicemail of Bethel’s plea offer told a different story. That recording “unambiguously” revealed that Bethel’s offer was for involuntary manslaughter — not voluntary manslaughter, as Bethel had later claimed — and that Bethel had never imposed any deadline for the defendants to accept the offer.
Based on this evidence, Kendall concluded that Bethel misrepresented his plea offer to the Court and held that the defendants’ acceptance of Bethel’s offer had created a binding plea agreement. Accordingly, Kendall scheduled a change-of-plea hearing for February 2, 2009 at 4:00 p.m., cancelling jury selection and the jury trial. Unhappy with this course of events, Bethel repeatedly interrupted and traded jabs with Kendall, who admonished him several times. That back-and-forth culminated with Bethel informing Kendall that he would not be present for the change-of-plea hearing. Kendall responded that he did not “need to know that” and proceeded to schedule the change-of-plea hearing anyway.
On the morning of the hearing, Bethel appealed Kendall’s decision to enforce the oral plea offer to the Virgin Islands Supreme Court. And consistent with his earlier promise, he did not show up for the change-of-plea hearing at 4:00 p.m. that afternoon. After waiting fifteen minutes without any sign of Bethel, Kendall adjourned the hearing, held Bethel in contempt, and issued a warrant for his arrest. At about 4:30 p.m., Bethel was arrested and remained under the control of the Bureau of Corrections until the next morning. At the time, Bethel told the media and the Virgin Islands Supreme Court that he had been incarcerated overnight •— a statement that was later revealed to be false when Bethel admitted that the warden had allowed him to spend the night at home without judicial authorization and without the $10,000 bail set by Kendall.
At a hearing the next day, Bethel apologized to Kendall for his “tardiness” and explained that he was “in the process of filing papers” and “looking for a parking space.” Although Kendall concluded that these explanations were false, he accepted an apology from Bethel and *725 “deferred]” from any decision to hold him in contempt. Kendall never revisited the issue of Bethel’s contempt. At the end of the hearing, Kendall returned to the issue of whether the plea offer for involuntary manslaughter was enforceable. Kendall asked Bethel and defense counsel to submit supplemental briefing on Virgin Islands v. Scotland, 614 F.2d 360, 17 V.I. 623 (3d Cir. 1980), a Third Circuit case holding that a prosecutor may withdraw a plea offer at any time before the court accepts it unless the defendant detrimentally relies on the offer by, for example, pleading guilty. Kendall stated that “if Scotland is dispositive, the Court will proceed to trial; if not, the Court will enforce the plea agreement.”
Beginning that same day, the Virgin Islands Daily News published several articles about Bethel’s arrest, detention for contempt, and eventual release. One of the articles recounted Bethel’s earlier misrepresentations at the hearing about the oral plea offer.
On February 5, Bethel moved for reconsideration of Kendall’s decision to enforce the plea agreement to involuntary manslaughter, but Kendall denied that motion. He concluded that the revelation of the plea agreement in numerous press reports (including the Daily News article) had tainted the jury pool and therefore made it impossible for Ford and Paris to receive a fair trial. Consequently, he reasoned that Ford and Paris had detrimentally relied on the plea agreement, and so he had to enforce it. Kendall then rescheduled the change-of-plea hearing for March 11, 2009.
B. The Writ of Mandamus Against Judge Kendall
Following Kendall’s decision to enforce the plea agreement for involuntary manslaughter, Bethel filed an amended notice of appeal with the Virgin Islands Supreme Court, indicating that there was no factual basis for acceptance of a guilty plea to involuntary manslaughter. Bethel simultaneously petitioned the Virgin Islands Supreme Court for a writ of mandamus directing Kendall not to enforce the plea agreement.
In the petition, Bethel made several mischaracterizations and also took swipes at Kendall. He claimed that Kendall had publicly “commented on [People v. Ford in a manner] adverse to the People’s position as reported in the Virgin Islands Daily News.” He said that Kendall “participated in plea negotiations directly by . . . mandating what the plea agreement should be in its entirety.” And in reference to his absence from the initial *726 change-of-plea hearing, Bethel claimed that he had told Kendall “he would not be appearing on Monday, February 2, 2009, for the Change of Plea, but he did not say and never intended to convey that he would not be appearing at all.” Kendall declined the Virgin Islands Supreme Court’s invitation to appear in the mandamus action in response to Bethel’s petition.
The Virgin Islands Supreme Court denied Bethel’s direct appeal because Kendall’s rulings were not yet final but granted his petition for mandamus. According to the Virgin Islands Supreme Court, settled United States Supreme Court precedent establishes that the “government may unilaterally withdraw a plea offer, even if ... the defendant” promises to accept the offer, because a “plea agreement, as a unilateral contract, cannot become binding on the parties through the defendant’s mere promise of performance but by the defendant’s actual performance — a change of plea to guilty.” And although a limited exception to this rule exists when the defendant detrimentally relies upon a plea offer, see Scotland, 614 F.2d at 365, the Virgin Islands Supreme Court concluded that Ford and Paris had not detrimentally relied on the plea offer to involuntary manslaughter at the time it was withdrawn. In the Virgin Islands Supreme Court’s view, Kendall had incorrectly and prematurely concluded that the defendants could not get a fair trial. Rather, Kendall was required “ ‘at the very least. .. [to] conduct[] an immediate voir dire inquiry to determine if the jurors had read the [media reports] and, if they had, whether they could nevertheless render a fair and true verdict.’ ” Id. (quoting United States v. New Jersey, 519 F.2d 1356, 1357 (3d Cir. 1975)). In addition, Kendall had “ ‘an affirmative constitutional duty to minimize the effects of [any] prejudicial pretrial publicity.’ ” 2 App. 16 (quoting United States v. Scarfo, 263 F.3d 80, 90 (3d Cir. 2001)). Consequently, “even if [Kendall] could have properly . . . found that pretrial publicity prejudiced [Ford and Paris], [he] was still obligated to employ less drastic curative measures, such as a continuance or change of venue, prior to ordering the extreme remedy of specific performance of a withdrawn plea offer.”
In issuing its writ of mandamus on May 13, 2009, the Virgin Islands Supreme Court reversed Kendall’s orders enforcing the oral plea offer, vacated his order scheduling a change-of-plea hearing for March 11, 2009, and remanded the case “for proceedings consistent with” its opinion. The writ did not provide any additional instructions to Kendall.
*727 C. Kendall’s Subsequent Opinion and Recusal
After the writ of mandamus issued, Ford and Paris accepted Bethel’s offer to plead guilty to voluntary manslaughter, and Kendall scheduled a change-of-plea hearing. At the hearing, Bethel proffered what the evidence would show at trial, and Kendall conducted a plea colloquy with Ford and Paris to determine whether they agreed with Bethel’s account. Ford and Paris, though, stuck to their story that they were acting in self-defense. And that story was consistent with Bethel’s own review of the evidence: in a 2008 memorandum to his superiors, Bethel concluded that the victim “initiated a deadly confrontation with [Ford] by threatening and chasing him with an ax handle which unfortunately resulted in the death of [the victim] by gunshots from the defendants.” Kendall concluded (and Bethel agreed) that there was an insufficient factual basis to support the defendants’ guilty plea to voluntary manslaughter. As a result, Kendall had no choice but to reject the pleas and plea agreement.
Rejecting the plea agreement left Kendall in what he considered a difficult situation. Notwithstanding the insufficient factual basis for voluntary manslaughter and Bethel’s own “serious doubt,” Bethel “unequivocally” planned to prosecute Ford and Paris for not only the voluntary manslaughter, but also first-degree assault, first- and second-degree murder, aiding and abetting third-degree assault, and unauthorized possession of a firearm. That decision to pursue the more-serious charges, as Kendall noted, contradicted Bethel’s own factual proffer on how the victim died: first-degree assault requires “intent to murder” and murder requires proof of “malice aforethought,” yet Bethel’s own factual proffer showed that it was the victim who “initiated a deadly confrontation” with the defendants. In Kendall’s view, Bethel’s continued pursuit of these unsupported charges would “be tantamount to perpetrating a fraud upon the Court.”
But Kendall recognized that he had “to follow [the Virgin Islands Supreme Court’s] directions with respect to the disposition of this matter.” And having rejected the plea agreement, Kendall’s “only alternative [was] to have this matter set down for trial according to the Supreme Court.” With those determinations made, Kendall promised the parties that he would memorialize his reasons for rejecting the plea agreement in a written opinion.
*728 On July 7, 2009, Kendall filed a thirty-one page opinion “for publication.” As promised, the Ford opinion recounted the background of the criminal case, including the events that gave rise to the writ of mandamus, and memorialized his reasons for rejecting the plea agreement to voluntary manslaughter. But the opinion also took two unexpected turns, both of which later became the basis for Kendall’s criminal-contempt convictions: First, the opinion offered a point-by-point denunciation criticism of the Virgin Islands Supreme Court’s decision to issue the writ of mandamus. The opinion characterized the Virgin Islands Supreme Court’s reasoning as erroneous, “improper,” having “no rational basis,” lacking “merit,” and “making no sense.” In re Kendall, 55 V.I. 888, 899 & n.6 (V.I. 2011). Indeed, the opinion went so far as to say that the writ of mandamus “was apparently sought and issued to facilitate [Bethel’s] blatant misconduct and perpetrate a fraud on the [Superior] Court.” Id. at 899 n.6. Its issuance, Kendall wrote scathingly, was therefore “contrary to law and all notions of justice.” Id.
Second, Kendall recused himself from presiding over further proceedings in the Ford case. Because of Bethel’s misrepresentations concerning the oral plea agreement and his continued pursuit of more-serious charges that contradicted his own factual proffer, Kendall lost the ability to believe “any of [Bethel’s] further representations” in the Ford case. Moreover, Bethel’s decision to press the unsupported, more serious charges enhanced Kendall’s nagging concern that the extensive pretrial publicity would deny the defendants’ their Sixth Amendment rights to a fair and impartial jury. In short, Kendall said he could no longer “be a party to [Bethel’s] egregious misconduct.”
After Kendall issued this opinion, People v. Ford was reassigned to James S. Carroll III. Judge Carroll held a pretrial conference on July 23, 2009. The People were not prepared to proceed to trial at that time because certain witnesses were unavailable. So Judge Carroll scheduled jury selection and trial for November 23, 2009.
Meanwhile, Ford and Paris petitioned the Third Circuit for a writ of certiorari to review the Virgin Islands Supreme Court’s writ of mandamus and its conclusion that Bethel’s plea offer for involuntary manslaughter was not enforceable. When November 23 arrived, the government indicated that it was not prepared to begin trial because it was awaiting a ruling by the Third Circuit on the defendants’ certiorari petition. In fact, the Third Circuit had denied the petition a few days earlier on November *729 17. Judge Carroll nonetheless continued jury selection until April 12, 2010, at the request of Paris’s counsel because two defense witnesses either could not be located or had to be flown to the Virgin Islands. Although Ford died before he could go to trial, a jury ultimately acquitted Paris.
D. The Criminal-Contempt Charges Against Kendall
The Virgin Islands Supreme Court did not take Kendall’s recalcitrance lying down. They had no mechanism for disciplining Kendall: in an earlier challenge by Kendall, the statute authorizing the Virgin Islands Commission on Judicial Discipline to investigate and remove Superior Court judges was struck down by this Court as unconstitutional. See Kendall v. Russell, 572 F.3d 126, 138, 52 V.I. 1021 (3d Cir. 2009). Nor had the Virgin Islands Supreme Court yet issued new disciplinary rules applicable to judges.
Believing that they had no other alternatives, the Justices ordered Kendall to show cause why he should not be held in criminal contempt. That show-cause order charged Kendall with three counts of indirect[1] criminal contempt:
(1) Count 1: Obstructing the administration of justice by issuing the Ford opinion critical of the Justices’ writ of mandamus;
(2) Count 2: Failing to comply with the writ of mandamus by refusing to schedule People v. Ford for trial, refusing to consider a change of venue or continuance to minimize pretrial publicity, and recusing himself to avoid complying with the writ of mandamus; and
*730 (3) Count 3: Misbehaving in his official transactions as an officer of the court by issuing his Ford opinion and disobeying the writ of mandamus.
The Virgin Islands Supreme Court appointed a special prosecutor to pursue the criminal-contempt charges and a Special Master to rule on all non-dispositive motions, manage discovery, preside over the trial, and recommend findings of fact and conclusions of law. Much like the relationship between a magistrate judge and a district judge, see generally 28 U.S.C. § 636, the Justices had the ultimate authority to adopt or reject the Special Master’s recommendations.
Before trial, Kendall moved to disqualify all three Justices of the Supreme Court because they were the target of his opinion’s criticism. The Justices denied this motion, and Kendall’s case proceeded to trial. After the People rested, Kendall moved for a judgment of acquittal based on insufficient evidence. He also moved for a mistrial, arguing that the Justices violated his due-process right by not personally attending the trial and observing the witnesses’ live testimony before making findings of fact in the case. The Special Master recommended denial of this motion, and the Supreme Court adopted that recommendation.
At the conclusion of the trial, the parties submitted proposed findings of fact and conclusions of law to the Special Master. The Special Master recommended that Kendall be acquitted on all charges. After considering supplemental briefs from both sides and reviewing a video recording of a “majority” of the proceedings before the Special Master, the Virgin Islands Supreme Court rejected the Special Master’s ultimate recommendation of acquittal and found Kendall guilty on all counts.
In sentencing Kendall, the Justices ordered him to pay a $1,000 fine on Count 1[2] but stayed sentencing for the remaining charges because all three charges arose from the same conduct. The Supreme Court also depublished Kendall’s Ford opinion.
*731 E. This Appeal
Kendall sought review of his convictions by petitioning this Court for a writ of certiorari.[3] We granted his petition on the following questions:
1. Whether the First Amendment limits the imposition of criminal contempt for statements made in a judge’s written opinion and if so, the scope of the limitation and its application in this case;
2. whether the Virgin Islands Supreme Court erred in imposing criminal contempt on the charges of failure to comply with its mandamus order of May 13,2009, in In re People of the Virgin Islands, 51 V.I. 374;
3. Whether the Virgin Islands Supreme Court Justices erred in not recusing themselves from this matter; and
4. Whether [Kendall] impliedly consented, or waived any challenge, to conducting the show cause hearing before a special master and, if not, the propriety of that procedure.
I
On Count 1, Kendall was convicted of indirect criminal contempt for obstructing the administration of justice by publishing inflammatory remarks about the Virgin Islands Supreme Court in his Ford opinion. Kendall argues that the remarks in his Ford opinion are protected by *732 freedom of speech and therefore cannot serve as a basis for his conviction.[4] We agree.
*733 A. The Scope of Constitutional Protection for Judicial Speech
The Supreme Court has yet to address the. scope of a judge’s freedom of speech as a sitting judge. See Republican Party of Minn. v. White, 536 U.S. 765, 796, 122 S. Ct. 2528, 153 L. Ed. 2d 694 (2002) (Kennedy, J., concurring) (“This case does not present the question whether a State may restrict the speech of judges because they are judges — for example, as part of a code of judicial conduct; the law here regulates judges only when and because they are candidates.”). Yet other federal and state courts have repeatedly held that a “judge does not check his First Amendment rights at the courthouse door, to be reclaimed at the expiration of his judicial tenure.”[5] In re Judicial Misconduct, 1289, 1289 (9th Cir. Jud. Counc. 2011) (Kozinksi, C.J., sitting alone).
*734 We agree. What ajudge says in an opinion is sufficiently expressive to trigger First Amendment review. The judge “inten[ds] to convey a particularized message” by explaining his legal analysis and conclusions, and there is a “great” likelihood that the opinion’s message would be understood by its audience — no less than if the judge had published the same analysis and commentary in a law review article.[6] Texas v. Johnson, 491 U.S. 397, 404, 109 S. Ct. 2533, 105 L. Ed. 2d 342 (1989) (quotation marks and citations omitted). Indeed, as pure speech on public issues, a judicial opinion “occupies the highest rung of the hierarchy of First Amendment values” and is thus “entitled to special protection.” Snyder v. Phelps, 131 S. Ct. 1207, 1215, 179 L. Ed. 2d 172 (2011) (quotation marks and citations omitted). To be sure, the rationale and holdings in an opinion often carry the force of law, but the mere fact that an opinion has legal effect does not “somehow deprive[] [an opinion] of its expressive component.” Doe v. Reed, 130 S. Ct. 2811, 2818, 177 L. Ed. 2d 493 (2010); see also Nev. Comm’n on Ethics v. Carrigan, 131 S. Ct. 2343, 2351, 180 L. Ed. 2d 150 (2011) (“It is one thing to say that an inherently expressive act remains so despite its having governmental effect, but it is altogether another thing to say that a governmental act becomes expressive simply because the governmental actor wishes it to be so. We have never said the latter is true.”). No one contends that Kendall’s opinion was not speech.
Having concluded that a judicial opinion qualifies as “speech,” we must determine the scope of its protection. Kendall argues that a judicial opinion is criminally punishable only under the government’s limited authority as sovereign to regulate speech that poses a clear and present danger to the administration of justice. By contrast, the Virgin Islands Supreme Court relied on the government’s broader authority to discipline attorneys for speech that is substantially likely to prejudice ongoing *735 proceedings and held that this broader authority allows the government to criminally punish judicial speech that poses the same threat.[7] We agree with Kendall.
As a general matter, the First Amendment protects freedom of expression regardless of its content or viewpoint and “regardless of whether it is disruptive, offensive, vulgar or insulting.” J.S. v. Blue Mountain Sch. Dist., 650 F.3d 915, 936 (3d Cir. 2011) (en banc) (Smith, J., concurring). Yet that rule is not absolute. When acting as sovereign, the government is empowered to impose time, place, and manner restrictions on speech, see Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S. Ct. 2746, 105 L. Ed. 2d 661 (1989), make reasonable, content-based decisions about what speech is allowed on government property that is not fully open to the public, see Ark. Educ. Television Comm’n v. Forbes, 523 U.S. 666, 674-75, 118 S. Ct. 1633, 140 L. Ed. 2d 875 (1998), decide what viewpoints to espouse in its own speech or speech that might be attributed to it, see Johanns v. Livestock Mktg. Ass’n, 544 U.S. 550, 560, 125 S. Ct. 2055, 161 L. Ed. 2d 896 (2005), and categorically restrict unprotected speech.[8] Sometimes, however, the government acts in a capacity that goes beyond merely being sovereign, and it gains additional authority to regulate speech in those capacities. *736 See, e.g., Garcetti v. Ceballos, 547 U.S. 410, 419-20, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006) (government as public employer); Morse v. Frederick, 551 U.S. 393, 396-97, 127 S. Ct. 2618, 168 L. Ed. 2d 290 (2007) (government as K-12 educator); Gentile v. State Bar of Nev., 501 U.S. 1030, 1066, 1075, 111 S. Ct. 2720, 115 L. Ed. 2d 888 (1991) (government as regulator of attorneys); Thornburgh v. Abbott, 490 U.S. 401, 407, 109 S. Ct. 1874, 104 L. Ed. 2d 459 (1989) (government as prison administrator); FCC v. Pacifica Found., 438 U.S. 726, 748-49, 98 S. Ct. 3026, 57 L. Ed. 2d 1073 (1978) (government as regulator of broadcast radio and television); Parker v. Levy, 417 U.S. 733, 758-59, 94 S. Ct. 2547, 41 L. Ed. 2d 439 (1974) (government as military commander).
In the realm of speech about ongoing judicial proceedings, the government’s authority as sovereign provides only limited power to criminally punish speech by those outside the judicial system. As the Supreme Court made clear in a trio of cases involving members of the press held in criminal contempt for their news stories, speech about ongoing judicial proceedings is criminally punishable only if it poses a clear and present danger of obstructing or prejudicing the ongoing proceedings. Craig, 331 U.S. at 372; Pennekamp v. Florida, 328 U.S. 331, 348, 66 S. Ct. 1029, 90 L. Ed. 1295 (1946); Bridges v. California, 314 U.S. 252, 260-63, 62 S. Ct. 190, 86 L. Ed. 192 (1941); see also Standing Comm. on Discipline of U.S. Dist. Court for Cent. Dist. of Cal. v. Yagman, 55 F.3d 1430, 1442 (9th Cir. 1995). The government has greater authority to discipline speech about an ongoing judicial proceeding, though, when the speaker is an attorney involved in that proceeding. See Gentile, 501 U.S. at 1075. Because the attorney is likely to be viewed as “especially authoritative” and his statements are more “likely to influence the actual outcome of the trial,” the government has an overriding interest in limiting the attorney’s prejudicial comments to preserve the litigants’ constitutional rights to an impartial jury. Id. at 1074-75. Consequently, the attorney’s speech is subject to discipline at a lower threshold: when it is substantially likely to prejudice the proceedings. Id. at 1075.
That brings us to the question in this case: does the government’s broader authority to discipline attorney speech about ongoing proceedings also permit the government to hold a judge in criminal contempt for his speech about ongoing proceedings? We answer that question with a resounding “No.” Criminal contempt .is no mere disciplinary tool. It *737 derives, like all crimes, from a government’s power as sovereign. See Eash v. Riggins Trucking, Inc., 757 F.2d 557, 565-66 (3d Cir. 1985) (“[A] court’s broad power to discipline attorneys as officers of the court for misconduct not properly categorized as contempt is substantially different from the contempt power.”); Cammer v. United States, 350 U.S. 399, 408 n.7, 76 S. Ct. 456, 100 L. Ed. 474 (1956) (“ ‘The power to disbar an attorney proceeds upon very different grounds’ from those which support a court’s power to punish for contempt.” (quoting Ex Parte Robinson, 86 U.S. (19 Wall.) 505, 512, 22 L. Ed. 205 (1873))); see also Bagwell, 512 U.S. at 826 (describing criminal contempt as “a crime in the ordinary sense” (quoting Bloom v. Illinois, 391 U.S. 194, 201, 88 S. Ct. 1477, 20 L. Ed. 2d 522 (1968)). Because the government’s use of the criminal-contempt power is the sine qua non of a sovereign act, the government has no greater authority to hold someone in criminal contempt for their speech about ongoing proceedings than it would to criminally punish any speech. The government’s additional authority to discipline attorney speech is therefore inapposite. And that means the speech must present a clear and present danger — not just a substantial likelihood — of obstructing the administration of justice. Consequently, the First Amendment protects a judge’s opinion from criminal punishment unless his speech poses a clear and present danger to the administration of justice.[9]
The People, however, argue that Kendall’s opinion should receive no constitutional protection from criminal punishment. See People’s Br. at 15-16. The People analogize the Virgin Islands Supreme Court’s authority to punish lower-court judges’ speech to the government’s broad authority as public employer to discipline an employee for speech made pursuant to his official duties, see Garcetti, 547 U.S. at 421, and to the government’s broad authority as military commander to punish an officer’s *738 insubordinate speech towards his superiors, see United States v. Howe, 17 C.M.A. 165, 37 C.M.R. 429 (1967).
These analogies fall flat. As we have already explained, contempt is not discipline: the Virgin Islands Supreme Court acted as sovereign, not as public employer, by criminally punishing Kendall’s speech. And the Virgin Islands Supreme Court’s supervisory capacity over lower-court judges is hardly similar to the government’s capacity as military commander. The Supreme Court has long differentiated military-speech restrictions from those in the civilian community based on considerations unique to the military. See, e.g., Goldman v. Weinberger, 475 U.S. 503, 507, 106 S. Ct. 1310, 89 L. Ed. 2d 478 (1986) (“Our review of military regulations challenged on First Amendment grounds is far more deferential than constitutional review of similar laws or regulations designed for civilian society. The military need not encourage debate or tolerate protest to the extent that such tolerance is required of the civilian state by the First Amendment[.]”); Parker v. Levy, 417 U.S. 733, 758-59, 94 S. Ct. 2547, 41 L. Ed. 2d 439 (1974) (“The armed forces depend on a command structure that at times must commit men to combat, not only hazarding their lives but ultimately involving the security of the Nation itself. Speech that is protected in the civil population may nonetheless undermine the effectiveness of response to command. If it does, it is constitutionally unprotected.” (citations omitted)). Those same considerations have no force in a civilian court system: Superior courts do not depend on an instinctive obedience to command structure that is critical to executing split-second battlefield orders. Nor do court systems have a similar need to restrict the role of dissent — unlike the military, the judicial mission depends on courts being deliberative bodies. Cf. United States v. Grimley, 137 U.S. 147, 153, 11 S. Ct. 54, 34 L. Ed. 636 (1890) (“An army is not a deliberative body. It is the executive arm. Its law is that of obedience. No question can be left open as to the right to command in the officer, or the duty of obedience in the soldier.”).
In summary, the First Amendment prevents the government from criminally punishing a sitting judge’s speech about one of his pending cases unless it poses a clear and present danger to the administration of *739 justice.[10] Cf. Citizens United v. FEC, 558 U.S. 310, 130 S. Ct. 876, 904, 175 L. Ed. 2d 753 (2010) (“If the First Amendment has any force, it prohibits Congress from fining or jailing citizens, or associations of citizens, for simply engaging in political speech.”).
B. Whether Kendall’s Opinion Crossed the Constitutional Line
We must vacate Kendall’s conviction because his opinion did not pose a clear and present danger of prejudicing the ongoing Ford proceedings. In the usual course of reviewing the sufficiency of evidence, we “review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence.” United States v. Wolfe, 245 F.3d 257, 261 (3d Cir. 2001) (citing Jackson v. Virginia, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)). But “in cases raising First Amendment issues,” we have an “obligation to ‘make an independent examination of the whole record’ in order to make sure that ‘the judgment does not constitute a forbidden intrusion on the field of free expression.’ ” Gentile, 501 U.S. at 1038 (quoting Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 499, 104 S. Ct. 1949, 80 L. Ed. 2d 502 (1984)). Consequently, we are “compelled to examine for [ourselves] the statements in issue and the circumstances under which they were made to see whether or not they do carry” the requisite threat to the administration of justice. Id. (quoting Pennekamp, 328 U.S. at 335); see also United States v. Cutler, 58 F.3d 825, 834 (2d Cir. 1995) (“Suffice *740 it to say that in First Amendment cases, we must scrutinize carefully the lower court’s application of the relevant standards to the facts at hand.”).
As we have explained, obstruction of the administration of justice contemplates interference with “the pendency of some sort of judicial proceeding.” United States v. Walasek, 527 F.2d 676, 678 (3d Cir. 1975). But obstruction of the administration of justice should “not be confused with obstruction of justice. Justice may be obstructed by mere inaction, but obstruction of the administration of justice requires something more — some act that will interrupt the orderly process of the administration of justice, or thwart the judicial process.” United States v. Warlick, 742 F.2d 113, 115-16 (4th Cir. 1984) (citing Ex parte Hudgings, 249 U.S. 378, 383, 39 S. Ct. 337, 63 L. Ed. 656 (1919)); compare In re Michael, 326 U.S. 224, 228, 66 S. Ct. 78, 90 L. Ed. 30 (1945) (“[Pjerjury alone does not constitute an ‘obstruction’ [of the administration of justice]... [and] there ‘must be added to the essential elements of perjury under the general law the further element of obstruction to the Court in the performance of its duty.’ ” (quoting Ex parte Hudgings, 249 U.S. at 384)), with Clark v. United States, 289 U.S. 1, 11, 53 S. Ct. 465, 77 L. Ed. 993 (1933) (concluding that a prospective juror who committed perjury had also obstructed the administration of justice because she had falsely testified to qualify for the jury even though she was biased and would acquit the defendant no matter what the evidence showed). And to transgress the threshold of clear and present danger, the speech must “constitute an imminent, not merely a likely, threat to the administration of justice. The danger must not be remote or even probable; it must immediately imperil.” Craig, 331 U.S. at 376.
The Virgin Islands Supreme Court relied on two theories in concluding that Kendall’s opinion was a clear and present danger to the fairness of the Ford case. Neither passes muster.
 According to the Virgin Islands Supreme Court, Kendall’s opinion was punishable because it “called the very integrity of [its mandamus] decision into question” by “blatantly accusing], without proof, the Justices ... of gross dereliction of their sworn duties and of committing illegal acts.” Yet Kendall’s criticism of the decision to issue mandamus — even if it unfairly impugned the Justices’ motives — is simply not enough. His after-the-fact critique “could not affect [the Justices’] ability to [fairly] decide” how to rule on the petition for a writ of mandamus. Pennekamp, 328 U.S. at 348 (holding that “criticism of *741 judicial action already taken,” even though “the cases were still pending on other points or might be revived by rehearings,” was not enough to satisfy the clear-and-present-danger standard). And the Virgin Islands Supreme Court’s interests in “protecting the reputation of its judges” and “maintaining [its] institutional integrity” are insufficient “to justify the subsequent [criminal] punishment of speech.” Landmark Commc’ns, Inc. v. Virginia, 435 U.S. 829, 841-42, 98 S. Ct. 1535, 56 L. Ed. 2d 1 (1978).
Nor, as the Virgin Islands Supreme Court intimated, did Kendall’s opinion delay or otherwise prejudice the criminal case against Ford and Paris. According to the Virgin Islands Supreme Court, Kendall’s opinion delayed the Ford trial by prompting the defendants to petition this Court for a writ of certiorari to review the mandamus decision.
The evidence unequivocally contradicts that account. The defendants’ mere filing of a petition for certiorari in this Court did not and could not have stayed their trial. See Brewer v. Quarterman, 474 F.3d 207, 210 (5th Cir. 2006) (en banc) (Dennis, J., dissenting from the majority’s exercise of jurisdiction) (explaining that while the granting of a petition for certiorari stays a case in the lower court, the filing of a petition for certiorari does not do so). Although the government moved to continue the Ford trial on November 23, 2009, to await a ruling on the defendants’ petition, this Court had already denied the defendants’ petition several days earlier on November 17, 2009. Judge Carroll (who ultimately presided over the Ford trial) nevertheless continued the trial at the defendants’ request because some key defense witnesses either could not be located or were off-island. Furthermore, even if there were some evidence that the defendants’ petition delayed the trial, the Virgin Islands Supreme Court did not identify any evidence that Kendall’s opinion caused the defendants to seek review of the mandamus decision by petitioning for certiorari. The record simply contains no support for the conclusion that Kendall’s opinion delayed the Ford trial. Accord Scarfo, 263 F.3d at 95 (reversing a gag order on an attorney’s speech about an ongoing case because there was no “evidence that [his] statements to the press jeopardized the fairness of the trial or in any way materially impaired or prejudiced the judicial power of the court”).
The People offer an additional argument about how Kendall’s opinion prejudiced the Ford case. According to the People, Kendall “deliberately contaminated the jury pool” by “publicly argu[ing] that the *742 People lacked sufficient evidence to convict the Ford defendants,” directly resulting in Paris’s acquittal. People’s Br. at 19. This is pure conjecture, and as conjecture it is belied by the fact that Judge Carroll was ultimately able to select an impartial jury for Ford’s trial. More importantly, the Virgin Islands Supreme Court did not rely on this theory in convicting Kendall. Nor can we. Turner v. Louisiana, 379 U.S. 466, 472-73, 85 S. Ct. 546, 13 L. Ed. 2d 424 (1965) (holding that the Sixth Amendment’s guarantee of a trial by jury requires'the jury to base its verdict only on the evidence presented at trial); TXO Prod. Corp. v. Alliance Res. Corp., 509 U.S. 443, 468, 113 S. Ct. 2711, 125 L. Ed. 2d 366 (1993) (Kennedy, J., concurring) (“Unlike a legislature, whose judgments may be predicated on educated guesses and need not necessarily be grounded in facts adduced in a hearing, a jury is bound to consider only the evidence presented to it in arriving at a judgment.” (internal citations omitted)).
On the whole, Kendall’s opinion contained “strong language, intemperate language, and, we assume, an unfair criticism. But a judge may not hold in contempt one ‘who ventures to publish anything that tends to make him unpopular or belittle him.’ ” Craig, 331 U.S. at 376 (quoting Craig v. Hecht, 263 U.S. 255, 281, 44 S. Ct. 103, 68 L. Ed. 293 (1923) (Holmes, J., dissenting)); see also In re Little, 404 U.S. 553, 556, 92 S. Ct. 659, 30 L. Ed. 2d 708 (1972) (overturning lawyers’ contempt convictions where “[tjheir convictions rest[ed] on nothing whatever except allegations [they] made in motions for change of venue and disqualification of [the judge] because of [his] alleged bias,” and noting that the lawyers had not “disobeyed any valid court order, talked loudly, acted boisterously, or attempted to prevent the judge or any other officer of the court from carrying on his court duties” (internal quotation marks and citations omitted)). Consequently, Kendall’s controversial remarks in the Ford opinion were protected by the First Amendment and cannot sustain his conviction on Count 1.
III.
On Count 2, Kendall was charged and convicted of indirect criminal contempt for failing to comply with the writ of mandamus. This conviction fails, however, because it is not supported by sufficient evidence.
*743 Like any crime, a conviction for criminal contempt requires proof beyond a reasonable doubt. Young v. United States, 481 U.S. 787, 798, 107 S. Ct. 2124, 95 L. Ed. 2d 740 (1987). And like any criminal prosecution, we review the sufficiency of the evidence de novo. United States v. Flores, 454 F.3d 149, 154 (3d Cir. 2006) (citing United States v. Brodie, 403 F.3d 123, 133 (3d Cir. 2005)). In doing so, we “ ‘examine the totality of the evidence, both direct and circumstantial,’ and ‘interpret the evidence in the light most favorable to the government as the verdict winner.’ ” United States v. Starnes, 583 F.3d 196, 206, 52 V.I. 1051 (3d Cir. 2009) (quoting United States v. Miller, 527 F.3d 54, 60, 62 (3d Cir. 2008)). If “all the pieces of evidence, taken together, make a strong enough case to let a jury find [the defendant] guilty beyond a reasonable doubt,” then we must uphold the jury’s verdict. Brodie, 403 F.2d at 134 (quoting United States v. Coleman, 811 F.2d 804, 807 (3d Cir. 1987)).
Criminal contempt generally requires the existence of a valid court order that the defendant knew of and willfully disobeyed. Doral Produce Corp. v. Paul Steinberg Assoc., Inc., 347 F.3d 36, 38 (2d Cir. 2003); see also FTC v. Lane Labs-USA, Inc., 624 F.3d 575, 582 (3d Cir. 2010) (discussing civil contempt). This willfulness requirement distinguishes civil contempt from criminal contempt and requires “a specific intent to consciously disregard an order of the court or where the defendant knows or should reasonably be aware” that he is disregarding the order. Doral Produce Corp., 347 F.3d at 38 (citations and internal quotation marks omitted); Waste Conversion, 893 F.2d at 610. Because of this willfulness requirement, good-faith compliance is a defense to criminal contempt but not civil contempt: “if the defendant’s alleged disobedience is consistent with a reasonable interpretation of the court’s order . . . and there is no other evidence of willfulness, we would be unable to affirm the conviction.” Doral Produce Corp., 347 F.3d at 38-39.
The Virgin Islands Supreme Court charged Kendall with disobeying the writ of mandamus in two ways: (1) by refusing to consider a change of venue or a continuance to minimize pretrial publicity; (2) by refusing to schedule the Ford case for trial and recusing himself instead of proceeding to trial (in the absence of a valid plea agreement). These two grounds, however, suffer from a similar defect: the writ of mandamus did not require Kendall to take any action with respect to these issues. Consequently, there is insufficient evidence that Kendall disobeyed any unambiguous term of the writ of mandamus.
*744 A. Refusal to Consider Alternatives to Minimize Pretrial Publicity
As the Virgin Islands Supreme Court acknowledged, the writ of mandamus “did not itself direct Kendall to consider a postponement or change of venue.” The Virgin Islands Supreme Court nonetheless determined that the writ “precluded Kendall from concluding” that the Ford defendants could not obtain a fair trial “without first considering a change of venue or a postponement.” Id.
Kendall did not, however, ignore the writ’s requirement that he consider ways to minimize pretrial publicity as part of any ruling on pretrial publicity because he never ruled on this issue. Rather, Kendall left this question open for his successor to decide. To be sure, his opinion describes his continued belief that “widespread publicity” disclosing the defendants’ earlier willingness to plead guilty “virtually foreclosed the selection of [a fair and impartial] jury in [the territory’s] very small population.” But his opinion does so only to explain some of the concerns motivating his recusal — not as part of any ruling on whether the pretrial publicity had violated the defendants’ right to a fair trial. Consequently, Kendall’s discussion of pretrial publicity did not violate the writ.
B. Recusal Instead of Proceeding to Trial
Likewise, the Virgin Islands Supreme Court conceded that the writ of mandamus did not “state that Kendall was forbidden from recusing himself and was required to immediately proceed to trial.” Kendall therefore cannot be held in contempt for recusing himself rather than proceeding to trial.
The Virgin Islands Supreme Court convicted him on Count 2 anyway. It concluded that Kendall was guilty because his recusal was a pretext to avoid complying with the writ, even though pretextual recusal would not violate the writ.[11] The Special Master concluded that the evidence was at *745 least “equally consistent with the premise that Kendall recused himself because he believed Bethel had engaged in prosecutorial misconduct and [that he] ‘could not, and ethically should not, render decisions in the case.’ ” V.I. S. Ct. Op. at 24. The Virgin Islands Supreme Court rejected the Special Master’s assessment for one reason: the timing of Kendall’s recusal. According to the Virgin Islands Supreme Court, all of Kendall’s reasons for recusal arose by March 9, 2009, yet Kendall “continued to issue rulings” in People v. Ford after that date, and waited until after the writ issued months later to recuse himself. Id. at 26. So the Virgin Islands Supreme Court concluded that the timing of Kendall’s decision revealed the real reason for his recusal: his disagreement with the writ of mandamus. Id.
That theory fails on its own terms. Its premise — that all of Kendall’s reasons for recusal arose before the writ was issued — is contradicted by the evidence. While Bethel made several misrepresentations to Kendall before the writ of mandamus was issued, the last straw came after the writ issued: Bethel proffered evidence in support of the plea agreement for voluntary manslaughter that tended to exculpate the defendants and confirm their self-defense theory. Even though Bethel’s factual basis was insufficient to support the plea agreement for voluntary manslaughter, Bethel forged ahead toward trial on more serious charges requiring proof of intent — an element contradicted by Bethel’s own previous account of the evidence. And he pressed forward despite his “serious doubt” about the evidentiary support for those more serious charges. This post-writ conduct led Kendall to conclude that Bethel was unethically trying to “win a conviction rather than seeing that justice is done” and that he was no longer able “to accord much credence to [Bethel’s] further representations” in the Ford case. As a result, there is not “substantial evidence that, when viewed in the light most favorable to the [People], would allow a rational trier of fact” to conclude that Kendall’s recusal was pretextual.[12] United States v. Wright, 665 F.3d 560, 567 (3d Cir. 2012) (internal quotation marks and citations omitted).
*746 Because none of the Virgin Islands Supreme Court’s grounds are sufficient to demonstrate Kendall’s willful non-compliance with the writ of mandamus, we must vacate his conviction on Count 2.
IV.
On Count 3, the Virgin Islands Supreme Court convicted Kendall of indirect criminal contempt for misbehaving in his official transactions based on the conduct underlying Counts 1 and 2. As the Virgin Islands Supreme Court explained, “the disposition of the obstruction of administration of justice and failure to comply charges also dictates the disposition of misbehaving in official transactions charge.” V.I. S. Ct. Op. at 28. Consequently, our reversal of Kendall’s convictions on Counts 1 and 2 requires us to reverse his conviction on Count 3.
V.
Lastly, Kendall argues that the Justices violated his right to due process in two ways: First, the Justices did not recuse themselves from presiding over his contempt charges. Second, the Justices, acting as the ultimate fact-finders in his case, convicted him without personally attending his trial and observing the witnesses while they testified. Because Kendall’s convictions were unconstitutional and based on insufficient evidence, we need not reach his due-process arguments.
* * * *
We talce no issue with the Virgin Islands Supreme Court’s well-intentioned desire to promote respect for the judiciary. Nowhere is such respect more important than among judges, who “have a common interest, as members of the judiciary, in getting the law right,” and who, “as a result, ... are willing to listen, persuade, and be persuaded, all in an atmosphere of civility and respect.” Harry T. Edwards, The Effects of Collegiality on Judicial Decision Making, 151 U. Pa. L. Rev. 1639, 1645 *747 (2003). Whatever its substantive merit, Kendall’s Ford opinion gratuitously undermined the collegial judicial atmosphere “that helps to create the conditions for principled agreement, by allowing all points of view to be aired and considered.” Id. But as Justice Black explained:
The assumption that respect for the judiciary can be won by shielding judges from published criticism wrongly appraises the character of American public opinion. For it is a prized American privilege to speak one’s mind, although not always with perfect good taste, on all public institutions. And an enforced silence, however limited, solely in the name of preserving the dignity of the bench, would probably engender resentment, suspicion, and contempt much more than it would enhance respect.
Bridges, 314 U.S. at 270-71; see also Landmark Commc’ns, Inc., 435 U.S. at 839 (“[T]he law gives ‘ [j]udges as persons, or courts as institutions... no greater immunity from criticism than other persons or institutions.’ ” (quoting Bridges, 314 U.S. at 289 (Frankfurter, J., dissenting))). We will reverse the judgment of the Virgin Islands Supreme Court and vacate all of Kendall’s convictions.

 Contempt can be either direct or indirect. See United States v. Dixon, 509 U.S. 688, 723 n. 1, 113 S. Ct. 2849, 125 L. Ed. 2d 556 (1993) (White, J., concurring in the judgment in part and dissenting in part) (“The distinction between, on the one hand, direct and summary contempt (i.e., contempt for acts occurring in the courtroom and interfering with the orderly conduct of business), and, on the other hand, nonsummary contempt, possesses old roots in the [Supreme] Court’s cases.”). Direct contempt describes “the judge’s authority to [summarily] impose punishment, without any form of trial, on one who engages in contumacious behavior in the judge’s presence,” such as a party’s repeated outbursts during a hearing or a witness’s refusal to testify during trial. Earl C. Dudley, Jr., Getting Beyond the Civil/Criminal Distinction, 79 Va. L. Rev. 1025, 1030 (1993). Indirect contempt targets acts “committed outside the presence of the court for which some fact-finding process is concededly necessary,” such as a person’s refusal to obey a court order. Id.

 The Virgin Islands Supreme Court subsequently stayed payment of the fine pending our review.

 The Virgin Islands Supreme Court had inherent and statutory jurisdiction over Kendall’s contempt proceeding. See 4 V.I. Code § 243(4) (“Every court shall have power . . . [t]o compel obedience to its judgments, orders, and process, and to the orders of a judge out of court, in all actions, or proceedings pending thereinf.]”); 4 V.I. Code § 281(2) (“Every judicial officer shall have power... [t]o compel obedience to his lawful ordersf.]”); Young v. United States, 481 U.S. 787, 793, 107 S. Ct. 2124, 95 L. Ed. 2d 740 (1987) (“[I]t is long settled that courts possess inherent authority to initiate contempt proceedings for disobedience to their orders----”). We have certiorari jurisdiction under 48 U.S.C. § 1613, which grants the Third Circuit certiorari jurisdiction to review final decisions of the Virgin Islands Supreme Court. See Kendall v. Daily News, 716 F.3d 82 (3d Cir. 2013) (holding that Congress’s recent elimination of the Third Circuit’s certiorari jurisdiction over decisions of the Virgin Islands Supreme Court does not affect, at a minimum, certiorari petitions filed before the effective date of the jurisdiction-stripping act).

 The ACLU, as amicus, argues that Kendall is shielded from criminal contempt by absolute judicial immunity. According to the ACLU, “if judges are immune from civil liability from third parties even for judicial actions done maliciously, with an improper motive, in bad faith, or which are unfair or controversial, then... they ought not face criminal liability for a mere written opinion.” ACLU Br. at 11. We do not need to address this argument because it is not properly before us. Judicial immunity is outside the questions on which we granted certiorari. See 3d Cir. LAR 112.10(a) (“If a petition for writ of certiorari is granted,... the case shall proceed as other appeals [do]... but with review limited to the questions on which the writ of certiorari was granted.”); see also Izumi Seimitsu Kogyo Kabushiki Kaisha v. U.S. Philips Corp., 510 U.S. 27, 32-33 (1993) (explaining the limited categories of “unusual circumstances,” in which the Court would consider an issue on which certiorari was not granted, such as “the possible absence of jurisdiction” (quotation marks and citations omitted)). What’s more, Kendall did not raise this argument before the Virgin Islands Supreme Court or in any of his briefs before this Court. See AT&T, Inc. v. FCC, 582 F.3d 490, 495 (3d Cir. 2009) (“An appellant waives an argument in support of reversal if he does not raise that argument in his opening brief.”), rev ’don other grounds, FCC v. AT&T, Inc., 131 S. Ct. 1177, 179 L. Ed. 2d 132 (2011).
In any event, Kendall would not be able to shoulder his burden of showing that he is entitled to judicial immunity from criminal contempt. Antoine v. Byers & Anderson, Inc., 508 U.S. 429, 432 n.4, 113 S. Ct. 2167, 124 L. Ed. 2d 391 (1993). Judicial immunity is a common-law doctrine designed to protect judicial independence. Nixon v. Fitzgerald, 457 U.S. 731, 759 n.2, 102 S. Ct. 2690, 73 L. Ed. 2d 349 (1982) (Burger, C.J., concurring) (“[T]he Constitution provides no hint that either judges, prosecutors, or congressional aides should beso protected [through absolute immunity]. Absolute immunity forjudges and prosecutors is seen to derive from the common law and public policy ....”). And while “[f]ew doctrines were more solidly established at common law than the immunity of judges from liability for damages for acts committed within their judicial jurisdiction,” Cleavinger v. Saxner, 474 U.S. 193, 200, 106 S. Ct. 496, 88 L. Ed. 2d 507 (1985) (quoting Pierson v. Ray, 386 U.S. 547, 553-54, 87 S. Ct. 1213, 18 L. Ed. 2d 288 (1967)), the same was not true for contempt or criminal liability, Mireles v. Waco, 502 U.S. 9, 10 n.1, 112 S. Ct. 286, 116 L.Ed. 2d 9 (1991) (recognizing that “a judge is not absolutely immune from criminal liability”)); O’Shea v. Littleton, 414 U.S. 488, 503, 94 S. Ct. 669, 38 L. Ed. 2d 674 (1974) (same). As the Supreme Court has recognized, at common law, superior courts routinely used their contempt power to hold inferior judges accountable for violating their writs and orders. Pulliam v. Allen, 466 U.S. 522, 532 n.19, 104 S. Ct. 1970, 80 L. Ed. 2d 565 (1984) (noting that a judge to whom a writ of mandamus or prohibition is issued “risks contempt for violating the writ,” and that “although courts properly are reluctant to impose costs against a judge for actions taken in good-faith performance of his judicial responsibilities, a court, in its discretion, may award costs against a respondent judge”); see, e.g., United States v. Justices of Lauderdale Cnty., 10 F. 460 (Cir. Ct., W.D.Tenn. 1882); Lapique v. Superior Court of L.A. Cnty., 68 Cal. App. 418, 229 P. 1014 (Cal. Dist. Ct. App. 1924); In re Smith, 2 Cal. App. 158, 83 P. 167 (Cal. Dist. Ct. App. 1905); Pittman v. Hagins, 91 Ga. 107, 16 S.E. 659 (1892); Havemeyer v. Superior Court of City and Cnty. of S.F., 87 Cal. 267, 275, 25 P. 433 (1890); In re Cary, 10 F. 622, 631 (S.D.N.Y. 1882); Gorham v. Luckett, 45 Ky. 638, 6 B. Mon. 638 (1846); People v. *733 Pearson, 4 Ill. 270 (1841); Floyd v. Barker, 77 Eng. Rep. 1305 (K.B. 1607); see also 3 William Hawkins, A Treatise of the Pleas of the Crown ch. 8 § 74 (7th ed. 1795) (“Justices of the peace are not punishable civilly for acts done by them in their judicial capacities, but if they abuse the authority with which they are entrusted, they may be punished criminally at the foot of the king by way of information.”). This practice held fast until codes of judicial conduct and judicial disciplinary commissions were created in the mid-twentieth century. See Jeffrey M. Sham, State Judicial Conduct Organizations, 16 Ky. L.J. 811, 811 (1987-88) (recounting the history of judicial discipline).
Indeed, there would be little reason to extend judicial immunity to criminal contempt. Unlike the danger that civil liability poses to judicial independence, any threat to judicial independence from criminal liability is “severely curtail[ed]” by “the limitations already imposed” by the exceptional nature of mandamus and the constitutional protections for criminal prosecutions (such as the right to a trial by jury, burden of proof, and presumption of innocence). Pulliam, 466 U.S. at 537-38 (rejecting Justice Powell’s dissenting argument that the “specter of contempt proceedings [against a judge who] violates] .. . injunctive orders is likely to inhibit unbiased judicial decisionmaking as much as the threat of liability for damages”). And an inferior-court judge’s freedom to disobey a superior court’s order is not the sort of independent judicial decision-making that immunity is designed to protect. Accord United States v. Claiborne, 727 F.2d 842, 847-48 (9th Cir. 1984) (rejecting a judge’s argument that separation-of-powers concerns should prevent executive officers from prosecuting federal judges for acts involving exercise of their judicial power); United States v. Hastings, 681 F.2d 706, 710-11 (11th Cir. 1982) (same); United States v. Isaacs, 493 F.2d 1124, 1140-44 (7th Cir. 1974) (same). With no support in history, law, or logic, we cannot extend judicial immunity to criminal contempt. Cf. Dennis v. Sparks, 449 U.S. 24, 29, 101 S. Ct. 183, 66 L. Ed. 2d 185 (1980) (rejecting an extension of derivative judicial immunity because the petitioners had “pointed to nothing indicating that, historically, judicial immunity insulated from damages liability those private persons who corruptly conspire with the judge”).

 E.g., In re Vincent, 2007 NMSC 56, 143 N.M. 56, 172 P.3d 605, 607 (N.M. 2007) (“[W]e recognize that there are nevertheless constitutional limitations on the regulation of judicial *734 speech.”); In re Sanders, 135 Wn.2d 175, 955 P.2d 369, 375 (Wash. 1998) (“Ajudge does not surrender First Amendment rights upon becoming a member of the judiciary.”).

 We do not decide, however, whether a judge’s ultimate rulings and judgments (as opposed to the explanations and commentary offered in opinions) also trigger First Amendment review. See Nev. Comm’n on Ethics v. Carrigan, 131 S. Ct. 2343, 2351 n.5, 180 L. Ed. 2d 150 (2011) (“A legislator voting on a bill is not fairly analogized to one simply discussing that bill or expressing an opinion for or against it. The former is performing a governmental act as a representative of his constituents; only the latter is exercising personal First Amendment rights.” (emphasis added) (citations omitted)).

 Because this case involves a sitting judge’s speech about one of his pending cases, we need not decide the constitutional standard for evaluating judicial speech in other contexts, such as a speech about a case over which he is not presiding or about topics unrelated to any pending case. Cf., e.g., Miss. Comm’n on Judicial Performance v. Wilkerson, 876 So. 2d 1006, 1011-12 (Miss. 2004) (en banc) (applying strict scrutiny to a state’s decision to discipline a judge for his extra-judicial statements on gay rights); In re Hey, 192 W. Va. 221, 452 S.E.2d 24, 33 (W.Va. 1994) (“Ajudge may not be disciplined consistent with the First Amendment... for his remarks during a radio interview in which he discussed his own disciplinary proceedings, criticized a member of his investigative panel, and stated his intention to take some reactive and lawful measure against the panel member.”).

 Examples of categorically unprotected speech include obscenity, see Miller v. California, 413 U.S. 15, 23, 93 S. Ct. 2607, 37 L. Ed. 2d 419 (1973), child pornography, see New York v. Ferber, 458 U.S. 747, 764-65, 102 S. Ct. 3348, 73 L. Ed. 2d 1113 (1982), advocacy that imminently incites lawless action, see Brandenburg v. Ohio, 395 U.S. 444, 447-48, 89 S. Ct. 1827, 23 L. Ed. 2d 430 (1969) (per curiam), fighting words, see Chaplinsky v. New Hampshire, 315 U.S. 568, 571-72, 62 S. Ct. 766, 86 L. Ed. 1031 (1942), true threats, see Watts v. United States, 394 U.S. 705, 708, 89 S. Ct. 1399, 22 L. Ed. 2d 664 (1969) (per curiam), commercial speech that is false, misleading, or proposes illegal transactions, see Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm’n of N.Y., 447 U.S. 557, 562, 566-67, 100 S. Ct. 2343, 65 L. Ed. 2d 341 (1980), and some false statements of fact, see generally United States v. Alvarez, 132 S. Ct. 2537, 2546-47, 183 L. Ed. 2d 574 (2012).

 The Supreme Court has not yet been asked to resolve whether or how Garcetti’s government-employer rationale extends to disciplinary restrictions on a judge’s on-the-job speech. See White, 536 U.S. at 796 (Kennedy, J., concurring) (“Whether the rationale of [our public-employee-speech cases] could be extended to allow a general speech restriction on sitting judges ■— regardless of whether they are campaigning — in order to promote the efficient administration of justice, is not an issue raised here.”); see also In re Vincent, 172 P.3d at 608 (“[E] valuating the constitutionality of restrictions on the political speech of a judge does not fit neatly into the existing analytical framework for First Amendment analysis. Selecting the appropriate framework for analysis has become even more difficult since White.”) Since that question is not implicated here, we leave it for another day.

 The Virgin Islands Supreme Court did not base Kendall’s conviction on a conclusion that his words were defamatory. See Standing Comm. on Discipline of U.S. Dist. Court for Cent. Dist. of Cal. v. Yagman, 55 F.3d 1430, 1438 (9th Cir. 1995) (“It follows that statements impugning the integrity of a judge may not be punished unless they are capable of being proved true or false ....”) And no such conclusion would be possible here. Contrary to the Virgin Islands Supreme Court’s characterization, Kendall’s remarks cannot be reasonably interpreted as “blatantly accusing], without proof, the Justices ... of gross dereliction of their sworn duties and of committing illegal acts.” Kendall’s statements were nothing more than “rhetorical hyperbole” using language in a “loose, figurative sense” and therefore cannot be interpreted as asserting actual facts about the Justices. Nat’l Ass’n of Letter Carriers v. Austin, 418 U.S. 264, 284-85, 94 S. Ct. 2770, 41 L. Ed. 2d 745 (1974); see also id. at 286 (holding that a union newsletter’s description of a “scab” as a “traitor” could not be construed as a factual assertion); Greenbelt Coop. Publ’g Ass’n v. Bresler, 398 U.S. 6, 14, 90 S. Ct. 1537, 26 L. Ed. 2d 6 (1970) (holding that a description of a public figure’s negotiating position as “blackmail” could not be construed as charging the plaintiff with committing a crime).

 Count 2 charged Kendall with violating the writ of mandamus by recusing himself, but the Virgin Islands Supreme Court ultimately convicted him of pretextually recusing himself even though his recusal did not violate the writ. This shift in theories raises a serious question as to whether Kendall was unconstitutionally convicted of a crime with which he was not charged. See United States v. Vosburgh, 602 F.3d 512, 532 (3d Cir. 2010) (“Because of [the Fifth Amendment], ‘a court cannot permit a defendant to be tried on charges that are not made in the indictment against him.’ ” (quoting Stirone v. United States, 361 U.S. 212, 216, 80 S. Ct. 270, 4 L. Ed. 2d 252 (1960))); United States v. Daraio, 445 F.3d 253, 260 (3d Cir. 2006) *745 (“ ‘The key inquiry is whether the defendant was convicted of the same conduct for which he was indicted.’ ” (quoting United States v. Robles-Vertiz, 155 F.3d 725, 729 (5th Cir. 1998))). Nevertheless, we do not consider this issue because Kendall has not raised it.

 Kendall also argues that the Virgin Islands Supreme Court lacked authority to hold him in criminal contempt for pretextual recusal where his recusal did not violate any court order. Because we conclude that Kendall’s conviction on Count 2 was not supported by sufficient *746 evidence, we need not consider whether the Virgin Islands Supreme Court was “inescapably wrong” about the scope of its contempt power. Defoe v. Phillip, 702 F.3d 735, 744 (3d Cir. 2012) (explaining that our limited oversight over the Virgin Islands Supreme Court “requires us to affirm [its] decisions . .. that are based on territorial law unless those decisions are inescapably wrong”). Nevertheless, we note that, so far as we can find, no court has ever used its limited contempt authority to punish a judge’s pretextual recusal absent the violation of a court order.